UNITED STATES of America, Appellant,

v.

Curtis L. PARKER and Martha Parker, Appellees.

No. 23296.

United States Court of Appeals Fifth Circuit.

April 14, 1967.

Rehearing Denied June 13, 1967.

Richard M. Roberts, Acting Asst. Atty. Gen., Tax Div., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Edward L. Shaheen, U. S. Atty., Edward V. Boagni, Asst. U. S. Atty., Shreveport, La., Richard C. Pugh, Atty., Dept. of Justice, Mitchell Rogovin, Asst. Atty. Gen., Melva M. Graney, Anthony Zell Roisman, Attys., Dept. of Justice, Washington, D. C., for appellant.

J. Philip Goode, Shreveport, La., for appellees.

Before GEWIN and GOLDBERG, Circuit Judges, and SPEARS, District Judge.

GOLDBERG, Circuit Judge:

The protesting and unhappy taxpayers, Curtis L. Parker and his wife, Martha, owned a wholesale and retail oil and gasoline business. On April 1, 1959, Parker and B. K. Eaves, a longtime employee, formed a Louisiana corporation incorporating Parker's business. The corporation had an authorized capital stock of 1,000 shares.

Parker subscribed to 800 shares and paid for them by transferring to the corporation certain property valued at $93,400.00 to be used in the corporation's business. Eaves subscribed to the remaining 200 shares. He paid $7,500.00 cash and agreed to pay the balance of $23,350.00 over a period of 5 years.

At the first meeting of the corporation's board of directors a resolution was passed accepting Eaves's subscription. He was issued stock certificates for the amount of stock paid for at that time (64.239 shares), and the board of directors resolved that the remainder of Eaves's stock certificates would be issued as their purchase price was paid. The Articles of Incorporation included a provision stating that none of the stock of the corporation might be transferred unless the stock were first offered to the corporation at the same price offered by the proposed transferee. (If the corporation did not accept the offer, another stockholder could.)

Parker and Eaves also entered into a stockholders' agreement[1] which provided

---

1. The operative provisions of the agreement are:

"3. In the event Eaves shall resign, be discharged, or otherwise cease to be permanently employed by said corporation for any cause, or in the event Eaves shall die, then in any such event Parker agrees to and shall purchase and Eaves agrees to and shall sell to Parker all Eaves' stock in said corporation, including all subscription rights and obligations connected therewith, at the following price: (a) Until April 1, 1960, at the price of $116.75 per share; (b) commencing and after April 1, 1960, the sale price shall be fixed from time to time by Parker and Eaves. In the event Parker and Eaves fail to fix said price or in the event Parker and Eaves are unable to agree as to said price, then in that event, said price shall be determined as follows:

The value of the stock for this purpose shall be its book value, increased or decreased by any difference in the book value of the corporation's assets and the market value of the corporation's assets as of the end of the month preceding the month in which the determination of price is to be fixed. The determination of the book value shall be made by the accounting firm then regularly servicing the corporation and such determination shall be conclusive on all parties. If there is no such accounting firm or if such firm should fail or refuse to make a determination of such valuation, then

the book value shall be determined by any other Certified Public Accountant who may be selected by mutual agreement of the parties. The market value of the corporation's assets shall be determined by three persons, one of whom shall be named by Parker, the second shall be named by Eaves, and the third shall be named by the first two appointed. In determining said book value or said market value, no allowance shall be made for good will or any other intangible assets except as reflected by the corporation's books at the time such valuation is made. In determining market value of dispensing equipment, the then current Exchange Code of Esso Standard Oil Company of New Jersey shall be used.

"4. This agreement shall extend to and shall include all shares of stock which may be acquired, from time to time, by Eaves. All shares of stock now owned by Eaves and as may be hereafter acquired, shall be non-transferable except in accordance with this agreement and shall be marked on the face thereon with the following:

'This certificate is subject to the provisions of a buy-and-sell agreement between B. K. Eaves and Curtis L. Parker dated April 1, 1959, and is non-transferable except in accordance therewith.'

"5. This agreement shall be binding and effective upon the legal representative, heirs, legatees or surviving spouse of

that whenever Eaves's employment should terminate for any reason, including death, his shares would then be purchased by Parker at a price to be governed by the fair market value per share of the corporation's assets, specifically excluding good will "or any other intangible asset." The value per share was set at $116.75 for the first year of the corporation's existence (until April 1, 1960), and thereafter the price was to be set by agreement between Parker and Eaves, with arbitration if they could not agree.

The face of all stock certificates issued to Parker and Eaves carried notice of the restriction on sale created by the Articles of Incorporation. Only the stock certificates issued to Eaves carried a legend that they were subject to the Eaves-Parker buy-and-sell agreement.

Also, at the first meeting of the board of directors, Parker sold to the corporation certain other assets which were depreciable property (such as motor vehicles, furniture and fixtures, and other equipment which Parker had apparently used in the business before the incorporation) worth $95,738.70. The corporation was to pay for this property in ten annual installments with interest of 5 per cent. Parker elected to treat the sale as a capital transaction, and reported the gain from it as long term capital gain. IRC § 1231.

The present suit arises because the Internal Revenue Service treated the gain

as ordinary income under IRC § 1239,[2] based upon the contention that the taxpayers owned more than 80 per cent "in value" of all outstanding stock of the corporation at the time of sale. The Service assessed deficiencies for the calendar years 1959, 1960, and 1961. Taxpayers paid the assessments under protest and sued in district court for a refund. 28 U.S.C.A. § 1346(a). The district court granted summary judgment for the taxpayers, and the government appeals. We reverse.

The government makes two contentions on appeal: first, that the taxpayers owned more than 80 per cent of the outstanding stock because Eaves, at the time of sale, had "outstanding" only those shares which he had paid for and had actually been issued to him and had a mere contract to purchase the remainder. Second, the government argues that even if the full 20 per cent of the shares allotted to Eaves was "outstanding" at the time of the sale, "the restrictions placed upon those shares and their inherent limitations made them worth less per share than Parker's." We disagree with the first of the government's contentions, but agree with the second.

## I.

The government argues that Eaves had a mere contract to purchase stock from the corporation, and that therefore the only "outstanding" stock which he owned at the relevant time was the 64.239 shares for which he had paid and for

the parties hereto and in the event of death of a party hereto, such shall be substituted for the deceased party in all respects."

2. "§ 1239. Gain from sale of certain property between spouses or between an individual and a controlled corporation.

  (a) treatment of gain as ordinary income.—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—
    (1) between a husband and wife; or
    (2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

  (b) section applicable only to sales or exchanges of depreciable property.—This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167.

  (c) section not applicable with respect to sales or exchanges made on or before May 3, 1951.—This section shall apply only in the case of a sale or exchange made after May 3, 1951."

which certificates had been issued to him. It relies on 5 LSA–R.S. § 12:15, subd. A.

"A. No allotment of shares of a corporation shall be made except:

(1) Pursuant to a subscription received therefor; or

(2) Pursuant to the declaration of a stock dividend; or

(3) Pursuant to purchase on payment therefor."

■ The government insists that because Eaves had not paid for 135.761 shares, he failed to own them under § 12:15, subd. A(3). The government here fails to recognize that § 12:15, subd. A sets out three ways to become a shareholder. While Eaves did not qualify under § 12:15, subd. A(3), he did qualify under § 12:15, subd. A(1). The record shows that Eaves had subscribed for all of the 200 shares and that the corporation had accepted the subscription.[3] It is only where there is no subscription that payment is a condition precedent to becoming an allottee.

The government next argues that because the 135.761 shares had been "allotted" but not "issued", they were not "outstanding" shares within IRC § 1239. Shares are not "issued" by the corporation until they are fully paid for.[4] But 5 LSA–R.S. § 12:1, subd. N says in part:

" 'Shareholder' means one who owns one or more shares. A subscriber becomes a shareholder upon the allotment of shares to him."

A comment by the chairman of the committee which drafted the Louisiana Act says in part:

"The subscriber's obligation to pay the subscription price and the procedures which the corporation law establishes for enforcing this obligation lend support to the argument that a binding subscription to shares grants the subscriber the rights of a shareholder * * *." Dunbar and Nabors, The Louisiana Business Corporation Law, printed at 5 LSA–R.S. xxxi, xlv.

■ Further, the Commissioners' Note to § 20 of the Model Act makes it clear that an allottee is a shareholder:

"To express what the corporation does when it makes a subscriber a shareholder, the word 'allot,' which is used in the British statutes, has been adopted. Subscriptions are accepted by the allotment of shares to the subscribers; when the shares have been paid for, a certificate is issued.

\* \* \* \* \* \*

"There is, however, no policy which would prevent one from being a shareholder subject to the obligation of paying for his shares in instalments. In fact, the prevailing practice permits shares to be paid for in instalments without preventing a subscriber from being a shareholder until he has paid the last instalment. Under the present scheme, the subscriber becomes a shareholder when shares are allotted to him in response to his application, but a certificate cannot be issued to

---

**3.** The following resolution appears in the minutes of the April 1 meeting:

"WHEREAS, B. K. Eaves had subscribed for one (1) share of the stock, without par value, in the Articles of Incorporation and desires to subscribe for one-hundred and ninety-nine (199) additional shares at the price of One Hundred Sixteen and 75/100 Dollars ($116.75) per share, for a total price of Twenty-Three Thousand Three Hundred Fifty and No/100 Dollars ($23,350.00) said subscription to be payable Seventy-Five Hundred Dollars ($7,500.00) cash, and the balance payable in five (5) an-

nual installments of Three Thousand Dollars ($3,000.00) each, and a final installment of Eight Hundred Fifty and No/100 Dollars ($850.00).

"NOW, THEREFORE, BE IT RESOLVED, that One Hundred Sixteen and 75/100 Dollars ($116.75) per share be fixed as the amount of consideration to be received by this corporation for said shares and that Mr. Eaves' subscription be accepted."

**4.** "§ 16. Issue of certificates of stock

A. A certificate of stock shall not be issued until the shares represented thereby have been fully paid for."

him until he has fully paid for his shares." Vol. 5 of LSA–R.S. p. 116.

Eaves owned the shares subject to his obligation to pay for them. Issuance of the certificates must await full payment only because

" * * * an express mandate of the Louisiana Constitution [La.Const. Art. 13, § 2] prohibits the issuance of a certificate of stock 'until the shares represented thereby have been fully paid for.' Thus, the share certificate cannot be issued in payment for services yet to be rendered, or property yet to be received. This restriction is necessitated by the negotiable qualities of the certificate. It does not prevent a subscriber from immediately becoming a shareholder upon the allotment of his shares, but does prohibit the issuance of a certificate to him until the shares are fully paid for." Bennett, Louisiana Business Corporation Act of 1928, 2 La.L.Rev. 597, 616 (1940).

A man need not hold issued shares to be a stockholder; he need only have been allotted shares. Eaves had 200 shares allotted to him by the corporation, and those shares were therefore not subject to disposition by the corporation or anyone other than Eaves. We agree with the district court that shares allotted under the Louisiana Act are "outstanding" within the meaning of § 1239.

## II.

Section 1239 prevents capital gain treatment of a "sale or exchange" of depreciable property to a controlled corporation or a spouse. Without this section a taxpayer who had property which had been depreciated to a low basis could sell that property to a controlled corporation or spouse and pay only capital gains rates on the gain. The transferee (who is virtually identical to the transferor in the proscribed area) could then redepreciate the property, using the sale price as a new basis. The depreciation, of course, would be deducted from ordinary income.[5] Section 1239 renders such a scheme profitless by taxing the gain on the transfer at ordinary rather than capital rates.

The issue here, of course, is whether Parker's corporation is sufficiently Parker's slave to justify invocation of § 1239. We have concluded that Parker owned, for purposes of § 1239, exactly 80 per cent of the corporation's outstanding stock. The decisive question now is whether this 80 per cent is, under § 1239, "more than 80 per cent *in value* of the outstanding stock." [emphasis added]

We first note what § 1239 does not say. It does not use the standard of § 368(c) which is invoked by § 351 for transfers to a controlled corporation in exchange for that corporation's stock or

5. The net effect may be shown graphically in a hypothetical case: R, the transferor, holds property depreciated to a value of $2,000. R sells the property for $6,000 to E, his controlled corporation. R pays a maximum capital gains tax of 25 per cent on the $4,000 gain, or a tax of $1,000. E, with a basis of $6,000 on the property takes depreciation deductions from ordinary income. After four or five years of these deductions E has depreciated the property back to the $2,000 basis. (See depreciation guidelines in Rev.Proc. 62–21; rates of depreciation in Rev.Proc. 65–13, Appendix I, Table A.) E has by then deducted $4,000 in depreciation from ordinary income. If E is in the 50 per cent bracket, the $4,000 in depreciation deductions has saved him $2,000 in income taxes. R has therefore paid a $1,000 capital gains tax and has saved E $2,000 in income taxes. If R and E are identical (and in cases covered by § 1239 they certainly may be considered so), then R has avoided $2,000 in taxes by paying only $1,000.

6. Section 351(a) says: "No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. For purposes of this section, stock or securities issued for services shall not be considered as issued in return for property."

securities.[6] Control is defined by § 368 (c) as

> "ownership of stock possessing at least 80 percent of the total combined *voting power* of all classes of stock entitled to vote and at least 80 percent of the total *number* of shares of all other classes of stock of the corporation." [emphasis added]

■■ By contrast, § 1239 says "more than 80 per cent *in value*." The words "in value" in § 1239 must have some meaning. Trotz v. Commissioner of Internal Revenue, 10 Cir. 1966, 361 F.2d 927, 930. We cannot indulge in statutory interpretation by excision. Statutory explication may be an art, but it must not be artful. Further, we cannot say that by using "in value" Congress intended us to consider only the factors of voting power or number of shares. "If the 80% determination is to be [merely] on the basis of the number of shares outstanding, no reason exists for the use of the words 'in value'." Trotz v. Commissioner of Internal Revenue, supra, 361 F.2d at 930. Or, if number of shares and voting power were the sole indicia, Congress could have limited § 1239 by using terms similar to those which § 351 draws from § 368(c) in an analogous situation within the Code's framework. "In value" is a broader phrase, and we think that it calls for the familiar, though difficult, process of fair market valuation.[7]

■ "The value of property is an underlying factor in a great number of income tax cases, particularly in such areas of the law as those involving the receipt of income, the computation of gain or loss, depreciation and depletion." 10 Mertens, Law of Federal Income Taxation § 59.01 (1964 revision). Value is not a strange or alien concept in tax law, and we have held that "There is no distinction, for most purposes * * *, in the meaning of fair market value as used in an estate tax case and one involving income tax." Champion v. Commissioner, 5 Cir. 1962, 303 F.2d 887, 892–893.

■ We next note that in the present case Eaves owned exactly 20 per cent of the outstanding stock, and Parker owned exactly 80 per cent. Therefore, if any fact can be found which shows that the value per share of Parker's stock exceeded by any amount, no matter how small, the value per share of Eaves's, then Parker owned more than 80 per cent in value of the outstanding stock. While it is true that Parker and Eaves owned the same class of stock, Eaves's stock was burdened with impedimenta from which Parker's stock was free. We hold that as a matter of law these impedimenta must have decreased the value per share of Eaves's stock, and as we need only show that this value per share was lower by any indeterminate amount, no matter how miniscule, than the value per share of Parker's stock, we are able to render judgment here without remand.[8]

The impedimenta which depress the value spring from two sources.

---

7. The district judge stated his findings of fact and conclusions of law with explicitness. He concluded, as do we, that market valuation was the proper test for § 1239. He found as a matter of law, however, that neither the restrictions on salability of the Eaves stock nor its minority position reduced its value per share, and it is here that we disagree. However, partly because of the peculiar circumstances of this case, but largely because the district judge stated his findings and conclusions so clearly and distinctly and isolated with precision the ground for his holding, we have been able to render unnecessary the remand which would usually be required. Even though we disagree on one point, the opinion of the district judge epitomizes the result sought by Rule 52(a), and thereby promotes the "just, speedy, and inexpensive determination of every action" sought by Rule 1.

8. In this aspect the present case differs from Trotz v. Commissioner of Internal Revenue, supra. There, the taxpayer Trotz owned 79 per cent of the outstanding stock and the lesser shareholder owned 21 per cent. The Tenth Circuit remanded the case for a factual determination by the Tax Court of whether any difference between the values per

A. *The restrictions on transfer of stock.* Eaves's stock was encumbered by two kinds of restrictions. First, the articles of incorporation stated that the corporation had the right of first refusal of any offer to sell to a third party. Second, Eaves's agreement with Parker stated that if Eaves left the employ of the corporation for any reason, he must sell all of his stock to Parker at a price representing the value per share of the assets, specifically excluding good will. Notice to the world of these restrictions, like the mark of Cain, was on the face of Eaves's stock certificates.

The practical effect of these restrictions was to reduce the number of opportunities for Eaves to sell or give away the stock and to place a limit (the duration of his employment) upon the period when he might hold the stock. "A commodity freely salable is obviously worth more on the market than a precisely similar commodity which cannot be freely sold." Judge Woodbury for the First Circuit in Worcester County Trust Co. v. Commissioner of Internal Revenue, 1 Cir. 1943, 134 F.2d 578, 582.

The alienability of Parker's stock was restricted only by the limitation imposed by the articles of incorporation. Whether this limitation, in the light of Parker's complete control, had any real effect on alienability we need not consider, for Eaves's stock was burdened not only by the articles but also by the extra and potent limitation of the buy-sell agreement. Even if we consider the Eaves and Parker stock as identically limited by the articles, Parker's stock was not affected by the buy-sell agreement; Eaves's was. "In our view it must be said that the restriction necessarily has a depressing effect upon the value of the stock in the market." Worcester County Trust Co., supra, 134 F.2d at 582. That such an extra limitation on alienability would depress market value to some greater extent is a well-recognized prop-

osition: Mailloux v. Commissioner of Internal Revenue, 5 Cir. 1963, 320 F.2d 60; James v. Commissioner of Internal Revenue, 2 Cir. 1945, 148 F.2d 236; Kirby v. Commissioner of Internal Revenue, 5 Cir. 1939, 102 F.2d 115; Mathews v. United States, E.D.N.Y.1964, 226 F. Supp. 1003; Baltimore National Bank v. United States, D.Md.1955, 136 F.Supp. 642. "Separation of the power of alienation from the ownership of property, or other forms of restriction against transfer, have in numerous cases been held to lessen the value of property." 10 Mertens, Law of Federal Income Taxation § 59.20 (1964 Rev.).

B. *The lack of control.* Eaves owned only 20 per cent of the stock. This left Parker in sole control of the corporation's affairs. Parker could, without Eaves, elect and remove directors and officers, amend the articles, and promulgate by-laws. He could dissolve the corporation. 5 LSA–R.S. § 12:54. With these powers, Parker controlled without possibility of challenge the entire operation from the smallest detail to the largest. He exercised so much power that the corporation was his alter ego, or his slave. This is the situation at which § 1239 aims.

Any purchaser of Eaves's stock would not be buying any degree of control over the corporation. The voting power which technically inhered in Eaves's stock was in reality worthless; Parker owned all of the real voting stock.

We hold that this disability which inhered in Eaves's stock reduced its value per share below that of Parker's stock as a matter of law. Cravens v. Welch, S.D.Cal.1935, 10 F.Supp. 94; Irene de Guebriant, 14 T.C. 611 (1950), rev'd on other grounds sub nom. Clafin v. Commissioner of Internal Revenue, 2 Cir. 1951, 186 F.2d 307; Mathilde B. Hooper, 41 B.T.A. 114 (1940). See Mathews v. United States, supra; Wor-

share of the large and small blocks brought Trotz's holding above 80 per cent in value. In contrast, in the present case any extra value per share in

Parker's stock will bring his holding above 80 per cent in value. No determination is needed of how much more per share Parker's stock is worth.

then v. United States, D.Mass.1961, 192 F.Supp. 727.

"Even absent any contemplated change in management, control increases the value of an investment by protecting it. The power to change the management, even while unexercised, protects the investor with control against an abrupt change by someone else and against a gradual deterioration of the incumbent management. Therefore, in a sense, controlling shares are inherently worth more than noncontrolling shares for reasons relating solely to investment value. When control is diffused, the same reasoning establishes, to a lesser degree, that shares enabling their holder to participate in control are worth more than those that do not. This is the strongest part of any argument against a broad reading of [Perlman v. Feldmann, 2 Cir. 1955, 219 F.2d 173, cert. denied 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955)]. It is the kernel of truth in the assertion that a premium paid for controlling shares only shows that controlling shares are inherently worth more than minority shares." Andrews, The Stockholder's Right to Equal Opportunity in the Sale of Shares, 78 Harvard L.Rev. 505, 526 (1965).[9]

In the vast majority of cases, courts of appeals have remanded where, as here, the lower courts failed to take into account all of the existing impedimenta on market value. For instance, in Kirby v. Commissioner of Internal Revenue, supra, we said:

"The Board [of Tax Appeals] * * declined to make any allowance against the value [of the stock] for the burden of the contract under which the stock had been bought and held. The result was neither, a true nor a fair, [sic] determination of value. The finding which mirrors that result cannot stand.

"Therefore * * * we reverse the order of the Board, and remand * * * for a redetermination * * *." 102 F.2d at 118.

We reiterate that in the present case it is sufficient for the rendering of judgment to note that the restriction on Eaves's stock and its minority qualities combine to have some depressing effect, no matter how small, on its value per share. We hold, therefore, that Parker owned more than 80 per cent in value of the corporation's stock, and that any gain on the sale of the depreciable property was properly taxed at ordinary rates. We render judgment for the government.

Reversed and rendered.

---

9. This entire article is concerned with the inherent disparity of value between controlling and non-controlling shares. Professor Andrews proposes a remedy to allow minority shareholders to share in the premium paid for controlling stock, but that remedy is not part of the law of Louisiana; the article's call for a remedy demonstrates how real the problem is.