**Alces P. ROBISHAW and Johnlyn
G. Robishaw**

v.

**The UNITED STATES.**

**No. 91–75.**

United States Court of Claims.

Feb. 20, 1980.

Louis B. Paine, Houston, Tex., attorney of record, for plaintiffs. John S. Boles, Gary P. Amaon, Gary J. Winston, and Butler, Binion, Rice, Cook & Knapp, Houston, Tex., of counsel.

Robert N. Dorosin, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and NICHOLS, Judge.

## OPINION

PER CURIAM:

This case comes before the court on exceptions by the parties to the recommended decision of Senior Trial Judge Mastin G. White, filed April 9, 1979, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended deci-

sion, as hereinafter set forth *, it hereby affirms and adopts the decision as the basis for its judgment in this case. Accordingly, the court concludes that plaintiffs are entitled to recover and judgment is entered for them for $93,274.13, with interest at the statutory rate.

## OPINION OF TRIAL JUDGE

WHITE, Senior Trial Judge:

The issue in this case is whether, for income tax purposes, royalty payments which the plaintiff Alces P. Robishaw ("Mr. Robishaw") received in 1970 and 1971 from a company known as Robishaw Manufacturing Corporation ("Manufacturing") should have been treated as ordinary income or as capital gains.

The royalty payments in question were made pursuant to an exclusive license which Manufacturing received from Mr. Robishaw on October 1, 1968, and which granted Manufacturing the exclusive right "to make, use, sell and rent throughout the world" devices utilizing certain patents owned by Mr. Robishaw and usually referred to in the record as "the Flexifloat patents." These patents cover flotation-type inventions which Mr. Robishaw made in 1955 and which consist of standardized, precision-built, watertight, buoyant units, made of welded steel and having external locking mechanisms for interconnecting adjacent units to each other. They can be combined into useful shapes that have adequate buoyancy, strength, and stability to support heavy mobile equipment while it is being used in construction operations on streams or lakes. The units, which are of varying sizes, are known by the trade name of Flexifloats.

Under the exclusive license agreement of October 1, 1968, between Mr. Robishaw and Manufacturing, the latter was obligated to pay Mr. Robishaw, as royalties, 7½ percent of the amounts received with respect to the

devices utilizing the Flexifloat patents. In their joint income tax returns for the years 1970 and 1971, Mr. Robishaw and his wife, the plaintiff Johnlyn G. Robishaw ("Mrs. Robishaw"),[1] treated the royalty payments from Manufacturing as gains from the sale of capital assets held for more than 6 months.

The parties agree that the Flexifloat patents were capital assets and that they were held by Mr. Robishaw for more than 6 months prior to October 1, 1968. Ordinarily, under such circumstances, an exclusive license granting the full and exclusive right to use a patent constitutes a sale for income tax purposes and thus entitles the licensor to treat as capital gains any royalties received pursuant to the license. *DuPont de Nemours v. United States*, 432 F.2d 1052 (3d Cir. 1970); Rev. Rul. 58–353, 1958–2 C.B. 408.

On audit of the plaintiffs' income tax returns for 1970 and 1971, however, the Internal Revenue Service denied capital gains treatment for the royalties received by Mr. Robishaw from Manufacturing and, instead, determined that such royalties were taxable as ordinary income. Deficiency notices for 1970 and 1971 were issued by the IRS; and the deficiencies, totaling $93,274.13, were paid by the plaintiffs. Subsequently, the plaintiffs timely filed a claim for the refund of the $93,274.13, plus interest. The claim was denied by the IRS, whereupon the plaintiffs instituted the present action.

In determining that the royalties which Mr. Robishaw received from Manufacturing in 1970 and 1971 should be treated as ordinary income for tax purposes, the Internal Revenue Service purported to act under the authority of section 1239 of the Internal Revenue Code of 1954 (26 U.S.C. § 1239 (1970)). This section, at the times involved in the present case, provided (among other things) that in connection with a sale of

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his opinion, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. The Robishaws were subsequently divorced.

property "between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, * * * any gain recognized to the transferor from the sale * * shall be considered as gain from the sale * * * of property which is * * *. [not] a capital asset * * *." Accordingly, it is necessary to determine whether, in connection with the granting by Mr. Robishaw to Manufacturing of the exclusive license respecting the Flexifloat patents on October 1, 1968, Mr. Robishaw owned "more than 80 percent in value of the outstanding stock" of Manufacturing.

In order to dispose of the question stated in the preceding paragraph, it will be necessary to outline in some detail the facts pertaining to the web of relationships involving Mr. Robishaw, Manufacturing, and a corporation known as Robishaw Engineering, Inc. ("Engineering").

On February 17, 1956, after Mr. Robishaw had invented the Flexifloat devices, he organized Engineering as a corporate entity for the marketing of Flexifloats. Mr. and Mrs. Robishaw were the sole stockholders of Engineering at the time of its incorporation.

On October 9, 1956, Mr. Robishaw granted to Engineering a non-exclusive license which authorized Engineering "to manufacture, lease, rent, use, buy or sell" devices under the Flexifloat patents, in consideration for paying to Mr. Robishaw a royalty of 1 percent on the annual gross sales and rental revenue obtained under the patents.

Engineering initially contracted with the Belmas Company to manufacture Flexifloats. Engineering did not manufacture Flexifloats itself because it did not have any manufacturing facilities and it was not economically practical to acquire and operate the extensive facilities that would have been required for the manufacture of the limited quantities of Flexifloats needed to serve the initially known potential market. The Belmas Company had adequate shop facilities and personnel to manufacture Flexifloats, it was an experienced steel fabricating company, and it needed additional work during slack times.

From the time of its organization until May 31, 1972, Engineering's business consisted primarily of the rental of Flexifloats. Engineering acquired storage space for the storage of Flexifloats when they were not out on rental jobs; and it also acquired the equipment and the personnel needed to handle, clean, maintain, and repair the Flexifloats as they came off rental jobs. The equipment included a mobile crane to handle the Flexifloats, steamcleaning equipment to clean them, metal-cutting and welding equipment to repair damage, and painting equipment to improve the appearance of and preserve the Flexifloats. In connection with the rental activities, Engineering provided substantial engineering services to its customers. These services included supervising the installation of Flexifloats, explaining the operation of the equipment, and showing customers how best to utilize the Flexifloat system.

By 1960, Mr. Robishaw had decided that a corporation should be organized to take over from Engineering the work of repairing and maintaining the Flexifloats. Accordingly, Manufacturing was incorporated on April 12, 1960, with Mr. Robishaw as the sole shareholder. The equipment and personnel previously acquired by Engineering for use in the repair and maintenance of Flexifloats were transferred to Manufacturing.

Manufacturing and Engineering occupied and used the same tract of land for their respective operations. The land was owned by a trust that had been established for the benefit of the Robishaw children, with one of the sons as trustee.

As of 1962, Manufacturing had assumed the full responsibility for the manufacture of Flexifloats. Because the Belmas Company was unable to produce Flexifloats with a constant degree of quality, it became apparent to Mr. Robishaw that the manufacture of Flexifloats would have to be performed under his own direct supervision. Manufacturing was the entity used for these manufacturing activities; and the necessary manufacturing equipment was acquired by Manufacturing.

On June 1, 1962, Mr. Robishaw and Manufacturing entered into a license agreement, in which Mr. Robishaw granted a non-exclusive license to Manufacturing "to manufacture, lease, rent, use, buy or sell" the devices covered by the Flexifloat patents, in consideration for paying to him a royalty of 1 percent of the annual gross sales and rental revenue obtained under such patents. Later, Mr. Robishaw and Manufacturing agreed to increase the royalty rate under the non-exclusive license to 3 percent of the annual gross sales and rental revenue obtained under the Flexifloat patents.

Because the demand for Flexifloats was not sufficient to cause full utilization of the manufacturing facilities needed to produce Flexifloats, it was contemplated that Manufacturing would also engage in the manufacture of products other than Flexifloats.

From the time of its organization through July 8, 1969, Mr. Robishaw was president of Manufacturing; and after July 8, 1969, Mr. Robishaw was chairman of the Board of Directors.

As of October 1, 1968, there were 1,100 shares of Manufacturing's stock outstanding, and they were owned by members of the Robishaw family as follows: Mr. Robishaw 764 shares (or 69.46 percent); Paul A. Robishaw (a son), 112 shares; John H. Robishaw (a son), 112 shares; and Sandra (Robishaw) Hill (a daughter), 112 shares. Title to Sandra (Robishaw) Hill's 112 shares of Manufacturing's stock was held in custodianship by Mr. Robishaw under the Texas Uniform Gifts to Minors Act.

Both parties have treated Sandra (Robishaw) Hill's 112 shares (or 10.18 percent) of Manufacturing's stock on October 1, 1968, as being constructively owned by Mr. Robishaw for the purposes of the present litigation, thus giving him, numerically, the ownership of 79.64 percent of Manufacturing's stock on October 1, 1968, the crucial date involved in the present litigation.

It was on October 1, 1968, that Mr. Robishaw entered into a new license agreement with Manufacturing covering the Flexifloat patents. This license agreement recited that Mr. Robishaw granted to Manufacturing "the full and *exclusive* right and license to make, use, sell and rent throughout the world" devices utilizing the Flexifloat patents, together with any improvements thereon, "and to sublicense others to do so" (emphasis supplied). Under the agreement, Manufacturing was obligated to pay to Mr. Robishaw, as royalties, 7½ percent of the amounts received with respect to the devices utilizing the Flexifloat patents. In connection with any sales by Manufacturing to its sublicensees, the agreement provided that the stated royalty percentage was to be paid on the amounts received by the sublicensees from their sales and rentals of Flexifloats.

The several factors which motivated Mr. Robishaw in granting to Manufacturing the exclusive license respecting the Flexifloat patents are outlined in the findings of fact, and need not be repeated here. For present purposes, it should suffice to say that the granting of the exclusive license to Manufacturing served what Mr. Robishaw reasonably regarded as a valid business purpose.

On October 1, 1968—the same day that Manufacturing received the exclusive license from Mr. Robishaw—Manufacturing entered into a non-exclusive sublicense agreement with Engineering covering the Flexifloat patents. This agreement recited that Manufacturing granted to Engineering "the non-exclusive right and license to make, use, sell and rent throughout the world" devices utilizing the Flexifloat patents, along with any improvements on such patents. It provided that Engineering was obligated to pay as royalties to Manufacturing 7½ percent of the amounts received by Engineering from its sales and rentals of products utilizing the Flexifloat patents.

Although the exclusive license agreement between Mr. Robishaw and Manufacturing, and the non-exclusive sublicense agreement between Manufacturing and Engineering, provided for the same royalty rate of 7½ percent, Manufacturing earned a reasonable profit under the exclusive license agreement. The profit was earned on the sale of

the Flexifloats which it manufactured. On sales to Engineering, Manufacturing charged an amount equal to its costs, plus a 15 percent profit factor. Engineering was the sole customer of Manufacturing in some years, and it was, by far, the major customer each year during the 12-year period, 1961–72. During that 12-year, Manufacturing's sales to Engineering amounted to $4,226,524.29, out of gross sales to all customers totaling $4,934,756.37.

Engineering, in turn, rented to its customers the Flexifloats purchased from Manufacturing.

On May 31, 1972—or some years after the date of October 1, 1968, that is directly involved in the present litigation—Manufacturing and Engineering entered into an agreement under which Manufacturing transferred all of its assets to Engineering, in consideration for the issuance by Engineering of 30,000 shares of common stock to be distributed pro rata to Manufacturing's stockholders, and the further obligation of Engineering to assume and pay all of Manufacturing's liabilities. The two companies further agreed that Manufacturing would discontinue all business operations after May 31, 1972, and that Engineering would take over all of Manufacturing's business operations as of June 1, 1972.

As of May 31, 1972, Mr. Robishaw owned 34.7 percent of Manufacturing's outstanding stock, Mrs. Robishaw owned 34.7 percent of the stock, and each of their three children owned 10.2 percent of the stock.

■ In considering the applicability of section 1239 of the Internal Revenue Code of 1954 to the present case, it should be stated at the outset that, according to court decisions, the test as to whether an individual taxpayer owns "more than 80 percent in value of the outstanding stock" of a corporation is not a numerical test, in which merely the percentage of stock owned by the taxpayer is determinative. *Childers v. United States*, 542 F.2d 1243 (4th Cir. 1976);

*United States v. Parker*, 376 F.2d 402 (5th Cir. 1967); *Trotz v. Commissioner*, 361 F.2d 927 (10th Cir. 1966).[2] A numerical count of outstanding shares, in and of itself, does not determine the percentage of value. *Trotz v. Commissioner, supra,* 361 F.2d at 930. The determination as to the percentage of value must be made on the basis of the real or actual value of the stock in the corporation held by the taxpayer, arrived at by a process of fair market valuation. *Childers v. United States, supra,* 542 F.2d at 1245. Thus, the "more than 80 percent in value" determination becomes a factual issue, to be resolved on the basis of the facts of a particular case. *Id.,* at 1245.

The case of *United States v. Parker, supra,* is of special interest in connection with our problem. In that case, the taxpayer Parker owned 800 shares of stock in a Louisiana corporation that had an authorized capital stock of 1,000 shares. The remaining 200 shares of stock in the corporation were owned by one Eaves, an employee of the corporation. Thus, numerically, Parker owned exactly 80 percent of the corporation's stock and Eaves owned 20 percent of the stock. Parker sold some property to the corporation on the installment plan and, in his income tax returns for the pertinent years, reported the gain from the transaction as a long-term capital gain. The Internal Revenue Service, however, treated the gain as ordinary income under section 1239 of the 1954 Code, and assessed deficiencies for the years in question, which the taxpayer paid. Suit for a refund was subsequently instituted.

The articles of incorporation of the Louisiana corporation provided that none of the stock of the corporation might be transferred unless the stock were first offered to the corporation at the same price offered by the proposed transferee. Parker and Eaves had also entered into an agreement which provided that whenever Eaves' employment should terminate for any reason, including

---

2. But see Note, *Meaning of "More Than 80 Percent in Value of the Outstanding Stock" under Section 1239,* 66 Mich.L.Rev. 533 (1968), for the argument that a numerical determination would be a more efficient and more rational test, given the purposes of section 1239, than a "value" test.

his death, his shares would be purchased by Parker at a price to be governed by the fair market value per share of the corporation's assets, excluding good will or any other intangible asset.

In determining whether Parker's ownership of 80 percent of the corporation's outstanding stock was, under section 1239 of the 1954 Code, "more than 80 percent in value of the outstanding stock" of the corporation, the court said (376 F.2d at 408) that if any fact could be found which showed that the value per share of Parker's 80-percent stock ownership exceeded, by any amount, the value per share of Eaves' 20 percent stock ownership, then Parker owned more than 80 percent in value of the corporation's outstanding stock. The court found that Eaves' stock was burdened with impediments from which Parker's stock was free, and concluded that, as a matter of law, these impediments must have decreased the value per share of Eaves' stock (*id.* at 408). The impediments on Eaves' stock consisted of the circumstances that his stock was encumbered by two kinds of restrictions on its transfer, whereas Parker's stock was subject only to a single restriction, and that Eaves, with only 20 percent of the stock, had no control over the corporation, whereas Parker, with 80 percent of the stock, was in sole control of the corporation's affairs.

It was sufficient for the court that the per-share value of Eaves' stock was less, to some extent, than the per-share value of Parker's stock. Even though the amount of the difference was "indeterminate" and may have been "miniscule" (376 F.2d at 408), it established that Parker's 80 percent stock ownership was "more than 80 percent in value of the outstanding stock" of the corporation and, therefore, entitled the Government to a judgment in the litigation.

At the trial of this case, the parties presented their "value" evidence in the form of testimony from an expert witness on each side.

The plaintiffs' expert witness was Robert E. Moroney, whose qualifications are set out in the findings of fact. The thrust of his testimony—and it was very persuasive—was to the effect that the value of Mr. Robishaw's block of 79.64 percent of Manufacturing's stock on October 1, 1968, *before* Mr. Robishaw granted to Manufacturing the exclusive license respecting the Flexifloat patents, was not in excess of 79.64 percent of the value of Manufacturing's outstanding stock.

Mr. Moroney's opinion was based upon his conclusions that, *before* the exclusive license was received by Manufacturing: Manufacturing did not have any "going concern" value; Manufacturing depended on Mr. Robishaw and could not have got along without him, but did not have with Mr. Robishaw an employment contract containing the usual non-competition clause; Mr. Robishaw controlled the Flexifloat patents, and if he had sold his block of stock in Manufacturing, he could have started another company to manufacture Flexifloats for sale to Engineering; Manufacturing did not own the land on which its operations were conducted, but the land was owned by a trust for the benefit of the Robishaw children, with one of the sons as trustee, and was occupied by Manufacturing under an oral, month-to-month lease; Manufacturing's only value, before obtaining the exclusive license under the Flexifloat patents, was in the movable buildings and the manufacturing assets, including a bridge crane, which it owned; and Mr. Robishaw's block of 79.64 percent of Manufacturing's stock would not have been attractive to an informed buyer in arm's-length bargaining to gain control of the company for liquidation purposes, because of the possibility of trouble from the minority stockholders (Mr. Robishaw's two sons).

The defendant's expert witness was John H. Harwood, whose qualifications are described in the findings of fact. The thrust of his testimony—which was also very persuasive—was to the effect that on October 1, 1968, *after* Manufacturing received the exclusive license respecting the Flexifloat patents, Mr. Robishaw's 79.64 percent ownership of Manufacturing's stock constituted more than 80 percent in value of Manufacturing's outstanding stock.

Mr. Harwood's opinion was based on his conclusions to the effect that *after* receiving the exclusive Flexifloat license: Manufacturing had a "going concern" value; with the exclusive Flexifloat license and its existing facilities and personnel, Manufacturing was capable of conducting business successfully without the guidance and direction of Mr. Robishaw; it would have been in the best interest of both Mr. Robishaw personally and of Engineering for Mr. Robishaw to agree with a purchaser of his controlling block of Manufacturing's stock to maintain a continuing relationship between Manufacturing and Engineering; the lack of such an agreement would have depressed the price that Mr. Robishaw could have obtained for his block of Manufacturing's stock, would have depressed the value of the minority blocks of Manufacturing's stock owned by Mr. Robishaw's two sons, would have depressed the value of Mr. Robishaw's stock in Engineering, and would have deprived Engineering of what was then the only available source of Flexifloats; and an arm's-length buyer of Mr. Robishaw's controlling block of Manufacturing's stock would have paid a higher price per share for such stock than would an arm's-length buyer of the minority blocks of stock in Manufacturing.

It is my view that the opinions of the two expert witnesses, as previously outlined, are both correct.

On the one hand, I believe that Mr. Moroney, the plaintiffs' expert witness, was correct in concluding that, *before* obtaining the exclusive Flexifloat license from Mr. Robishaw, Manufacturing did not have any "going concern" value, because if Mr. Robishaw had sold his 79.64 percent stock interest to another person, withdrawn from the corporation, and still retained the ownership and control of the Flexifloat patents, Manufacturing would have been unable to continue in business. The purchaser of Mr. Robishaw's 79.64 percent block of stock under such circumstances would have been entitled to receive 79.64 percent—and only 79.64 percent—of the proceeds from the liquidation of the physical assets of the corporation, while the minority stockholders

would have been entitled to receive precisely 20.36 percent of the proceeds. Consequently, *before* Mr. Robishaw granted the exclusive Flexifloat license to Manufacturing, the per-share value of Mr. Robishaw's 79.64 percent stock interest was not any greater than the per-share value of the stock owned by the minority stockholders; and, therefore, Mr. Robishaw did not own more than 79.64 percent in value of Manufacturing's outstanding stock.

On the other hand, I believe that Mr. Harwood, the defendant's expert witness, was correct in concluding that *after* the exclusive Flexifloat license vested in Manufacturing, the corporation did have a "going concern" value, because with the exclusive Flexifloat license and its existing facilities and personnel, the corporation would have been able to conduct business successfully without Mr. Robishaw's guidance and direction. A purchaser of Mr. Robishaw's 79.64 percent stock interest under such circumstances would have acquired the power of complete control over the going concern; and this power of control gave the 79.64 percent stock interest some increased value per share over and above the per-share value of the stock owned by the minority stockholders. Although the difference in value per share cannot be quantified with accuracy on the basis of the evidence in the record, it was undoubtedly sufficient to sustain the opinion of the defendant's expert witness that *after* the exclusive Flexifloat license was granted to Manufacturing, Mr. Robishaw's ownership of 79.64 percent of Manufacturing's outstanding stock, numerically, represented more than 80 percent in value of the corporation's outstanding stock.

■ It appears, therefore, that a crucial threshold question to be decided in the present case is whether, for the purpose of determining the applicability of section 1239 of the 1954 Code, Mr. Robishaw's block of 79.64 percent of Manufacturing's outstanding stock should be valued *before* or *after* the exclusive license respecting the Flexifloat patents vested in Manufacturing.

As the portion of section 1239 of the 1954 Code involved here is concerned with the

relationship existing between a stockholder and a corporation—and the power of the stockholder to influence the corporation—in connection with a transaction involving a sale of property by the stockholder to the corporation, or vice versa, it seems only logical to conclude that the significant thing is the relationship existing when the negotiations are in progress and an agreement is reached, rather than the relationship existing after the consummation of the transaction. After a transaction has been completed, the power of the stockholder to influence the decision of the corporation in connection with the particular transaction has already been exercised; and the subsequent relationship between the stockholder and the corporation cannot have any real significance for the purposes of section 1239.

That a taxpayer's stock ownership in a corporation is to be valued, for the purposes of section 1239 of the 1954 Code, prior to the completion of a sale transaction between the stockholder and the corporation draws support from Rev.Rul. 75–514, 1975–2 C.B. 116. That ruling dealt with a situation in which a corporation redeemed 85 percent of its outstanding stock from a stockholder who had theretofore owned 92 percent of the corporation's outstanding stock, and in payment distributed a building to the stockholder. One of the questions discussed was whether, for section 1239 of the 1954 Code to require ordinary income treatment of gain from the transaction, it was necessary that the stockholder should own more than 80 percent in value of the corporation's stock both before and after the exchange, or was it sufficient that the stockholder owned more than 80 percent in value of the stock at the time of the exchange. The ruling stated on this point was that section 1239 "makes no exception for a situation where, as in the instant case, control is relinquished in the sale transaction * * *."

Support for the view previously expressed is also found in two court cases, *Drake v. Commissioner*, 145 F.2d 365 (10th Cir. 1944), and *Federal Cement Tile Co. v. Commissioner*, 338 F.2d 691 (7th Cir. 1964).

Both cases involved the applicability of a provision in the Internal Revenue Code which was designated as section 24(b) in the 1939 Code and is now designated as section 267 in the 1954 Code. The provision states (among other things) that no deduction shall be allowed, for income tax purposes, with respect to a loss sustained from a sale or an exchange of property between an individual and a corporation "more than 50 percent in value of the outstanding stock of which is owned" by or for such individual. In each of these cases, a stockholder owned more than 50 percent in value of a corporation's outstanding stock at the time of a particular transaction between them, and less than 50 percent in value of the outstanding stock after the completion of the transaction. The stockholder in each case claimed to be outside the scope of section 24(b) of the 1939 Code (now section 267 of the 1954 Code). In each instance, however, the court looked to the time when the sale or exchange agreement was made—and not to the situation existing after the consummation of the transaction—in determining whether the agreement represented a transfer between a corporation and its controlling stockholder.

It should be noted, of course, that in the revenue ruling and in the two court cases recently discussed, both the numerical percentage and the value percentage of the stock owned by a stockholder in a corporation changed as a result of the transaction under consideration. In the case at hand, the transaction—i. e., the granting of the exclusive license respecting the Flexifloat patents by Mr. Robishaw to Manufacturing—operated in such a way as to change the percentage of value represented by Mr. Robishaw's stock interest, while leaving the numerical percentage of his stock ownership constant. There is no logical reason, however, to distinguish between these two types of situations with respect to the point in time when the pertinent statutory provision calls for the valuation determination to be made.

For the reasons previously stated, it is my opinion that Mr. Robishaw's 79.64 percent stock ownership in Manufacturing did not represent "more than 80 percent in value"

of the corporation's outstanding stock when Mr. Robishaw and Manufacturing negotiated and entered into the October 1, 1968, agreement whereby Mr. Robishaw granted to Manufacturing the exclusive license respecting the Flexifloat patents.

It necessarily follows, therefore, that as the Flexifloat patents were capital assets and were owned by Mr. Robishaw for more than 6 months prior to October 1, 1968, the royalties received by him in 1970 and 1971 under the exclusive license agreement were entitled to treatment as capital gains for income tax purposes; that the Internal Revenue Service erred in taxing such royalties as ordinary income; and that the plaintiffs are entitled to recover in the present litigation.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court, the court concludes as a matter of law that the plaintiffs are entitled to recover; and it is therefore ordered that judgment be and the same is entered for the plaintiffs in the sum of ninety-three thousand two hundred seventy-four dollars and thirteen cents ($93,274.13), with interest at the statutory rate.