**Harold P. DAHLGREN et al.,**
**Plaintiffs-Appellees,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 75–3263.**

United States Court of Appeals,
Fifth Circuit.

June 3, 1977.

Rehearing Denied Aug. 12, 1977.
See 557 F.2d 456.

Frank D. McCown, U. S. Atty., Ft. Worth, Tex., Scott P. Crampton, Asst. Atty. Gen., Wm. A. Friedlander, Murray S. Horwitz, Attys., Gilbert E. Andrews, Chief, Appellate Sec. Tax Div., U. S. Dept. of Justice, Washington, D. C., Martha Joe Stroud, Asst. U. S. Atty., Dallas, Tex., for defendant-appellant.

John L. Hauer, Robert Goodfriend, Clarice M. Davis, Dallas, Tex., for plaintiffs-appellees.

Before TUTTLE, WISDOM and COLEMAN, Circuit Judges.

TUTTLE, Circuit Judge:

The issue before the jury in this income tax refund suit was whether ownership by taxpayer of 79.975% of the capital stock of the company to which he made a sale of depreciable property was ownership of "more than 80 percent *in value* of the outstanding stock . . . ." [emphasis added] within contemplation of § 1239(a)(1) of the Internal Revenue Code of 1954.[1]

The jury answered special interrogatories stating that they found from a preponderance of the evidence that "[Dahlgren] did not own more than 80% in value 'of the stock of Dahlgren Manufacturing Company.'" The Commissioner, on appeal, did not contend that this was not a fact issue but places his appeal from the verdict and ensuing judgment on three separate grounds, hereinafter outlined.

## I. BACKGROUND FACTS

After engaging extensively in the art of commercial offset lithographic printing, Dahlgren obtained a patent on the "Dahlgren Continuous Duty Dampening System" (CDDS) in 1965. On February 1, 1966, he transferred his 85% interest in that patent to Dahlgren Manufacturing Company, which he had formed in 1959 and which already owned the remaining 15% of the patent. On this date, Dahlgren was the record owner of 79.975% of the stock in this company. The remaining 20.025% of the stock was held in two blocks of approximately 10% each. Prior to this transfer, according to testimony at the trial, a long-time associate, Broun, had an oral agreement with Dahlgren that if he would stay

1. SEC. 1239. Gain from sale of certain property between spouses or between an individual and a controlled corporation.

(a) *Treatment of gain as ordinary income.*—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—
(1) between a husband and wife; or
(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

(b) *Section applicable only to sales or exchanges of depreciable property.*—This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167.

on and work with Dahlgren for an unspecified period he would "own a percentage of that company" and would have a job as long as the company continued to produce.[2] The trial court also admitted in evidence a state trial court judgment entered in 1970, in which Broun was adjudged to be entitled to 10% of Dahlgren's stock as of February 1, 1964.

The Government's grounds of appeal are: (1) the trial court erred in not charging the jury as requested in several numbered charges to the effect that there is an inherent value attribute in a majority or controlling block of corporate stock which gives it a per share value greater than stock not in such majority block.[3] (2) that evidence of the Broun agreement and of the state court judgment was inadmissible because the claim for refund filed by Dahlgren did not contain facts adequately to apprise the Commissioner of Internal Revenue of the "exact basis" . . . "of the ground upon which the . . . refund [was] claimed." (3) finally, the Commissioner attacks the admissibility in evidence of the state court judgment on the ground of relevancy and materiality and, especially, without a limiting instruction that it was not "controlling as to the facts in this case."

## II. THE PARKER PRINCIPLE

The Government's first effort to put the trial court in error arose from the refusal of the trial court to give in charge to the jury what we may call the "Parker principle." The substance of the principle is that where it becomes necessary to ascertain whether a stockholding in a closely-held corporation under § 1239(a)(1) amounts to

2. This contract as testified to can be spelled out by the following questions and answers:

"THE REPORTER: 'QUESTION: Please state whether or not any agreement was entered into between you and Harold Dahlgren at that time with respect to your staying on.'
A. Yes, there was an agreement.
Q. (By Mr. Hauer) What was said by him to you and by you to him?
A. He said that if I would help him get this product to the market, if I would stay and continue to work with him, he had faith in the product, I had faith in the product, if I would continue, to help him we could build a company, I would own a percentage of that company and that I would have a job as long as that company continued to produce and we could both enjoy the fruits of our work.
Q. What did you say to him?
A. I said, 'I got nothing to lose. I didn't have any money then, I had nowhere to go, I might as well stay and give it a whirl.'
Q. You agreed to do it?
A. Yes.
Q. Did you stay?
A. Yes, sir.
Q. Starting in 1960 till to date?
A. Yes, sir."

3. The requested instructions were as follows:
No. 15. In determining whether the plaintiffs have proved by a preponderance of the evidence that Plaintiff Harold P. Dahlgren did not own more than 80 percent in value of the outstanding stock of Dahlgren Manufacturing Company, Inc., on February 1, 1966, you are instructed that shares of common stock of a majority block of shares are, on a per-share basis, more valuable than shares owned as part of a minority block of shares of the same corporation. This is true because of the control factor which is inherent in the share of the same corporation. This is true because of the control factor which is inherent in the share of the majority block.

No. 16. Absent any contemplated change in management, control increases the value of an investment by protecting it. The power to change the management, even while unexercised, protects the investor with control against abrupt change by someone else and against a gradual deterioration of the incumbent management. Therefore, in a sense, controlling shares are inherently worth more than noncontrolling shares for reasons relating solely to investment value. When control is diffused, the same reasoning establishes, to a lesser degree, that shares enabling their holder to participate in control are worth more than those that do not.

No. 17. It is possible to determine one valuable attribute of a share of stock without determining all its attributes.

Notwithstanding, if the plaintiffs are to succeed herein, they must prove by a preponderance of the evidence that this added value did not cause Plaintiff Harold P. Dahlgren's majority stock interest in Dahlgren Manufacturing Company, Inc., to have a value in excess of 80 percent of that of all the outstanding shares of the corporation.

No. 22. You are instructed that shares of stock constituting control of a corporation have a per-share value greater than the per-share value of stock constituting the minority interest of the corporation, all other matters being equal between all of the shares of the corporation.

an ownership of "more than 80 percent in value of the outstanding stock", the fact finder must be made aware of a rule of law to the effect that among the ingredients or attributes of value in the making of such a determination is the fact, if it be true, that the stock to be valued represents a majority or controlling stock of the corporation. It is clear that this states a correct rule of law as was announced in *United States v. Parker*, 376 F.2d 402 (5 Cir. 1967).

After stating what appeared to this Court to be the purpose for which Congress enacted § 1239, dealing with the sale or exchange to a "controlled corporation or a spouse," this Court said:

"The issue here, of course, is whether Parker's corporation is sufficiently Parker's slave to justify invocation of § 1239. We have concluded that Parker owned, for purposes of § 1239, exactly 80 per cent of the corporation's outstanding stock. The decisive question now is whether this 80 per cent is, under § 1239, 'more than 80 per cent *in value* of the outstanding stock.' [Emphasis in original].

   *    *    *    *    *    *

   . . . § 1239 says 'more than 80 per cent *in value*.' The words 'in value' in § 1239 must have some meaning. *Trotz v. Commissioner of Internal Revenue*, 10 Cir. 1966, 361 F.2d 927, 930. We cannot indulge in statutory interpretation by excision. Statutory explication may be an art, but it must not be artful. Further, we cannot say that by using 'in value' Congress intended us to consider only the factors of voting power or number of shares. 'If the 80% determination is to be [merely] on the basis of the number of shares outstanding, no reason exists for the use of the words 'in value'.' *Trotz v. Commissioner of Internal Revenue*, supra, 361 F.2d at 930. Or, if number of shares and voting power were the sole indicia, Congress could have limited § 1239 by using terms similar to those which § 351 draws from § 368(c), in an analogous situation within the Code's framework. 'In value' is a broader phrase, and we think that it calls for the familiar, though difficult, process of fair market valuation. (footnote omitted).

'The value of property is an underlying factor in a great number of income tax cases, particularly in such areas of the law as those involving the receipt of income, the computation of gain or loss, depreciation and depletion.' 10 Mertens, Law of Federal Income Taxation § 59.01 (1964 revision). Value is not a strange or alien concept in tax law, and we have held that 'There is no distinction, for most purposes  *  *  *, in the meaning of fair market value as used in an estate tax case and one involving income tax.' *Champion v. Commissioner*, 5 Cir. 1962, 303 F.2d 887, 892–893.

We next note that in the present case Eaves owned exactly 20 per cent of the outstanding stock, and Parker owned exactly 80 per cent. Therefore, if any fact can be found which shows that the value per share of Parker's stock exceeded by any amount, no matter how small, the value per share of Eaves's, then Parker owned more than 80 per cent in value of the outstanding stock. While it is true that Parker and Eaves owned the same class of stock, Eaves's stock was burdened with impedimenta from which Parker's stock was free. We hold that as a matter of law these impedimenta must have decreased the value per share of Eaves's stock, and as we need only show that this value per share was lower by any indeterminate amount, no matter how miniscule, than the value per share of Parker's stock, we are able to render judgment here without remand.[8]  376 F.2d 407–408.

[8] In this aspect the present case differs from *Trotz v. Commissioner of Internal Revenue*, supra. There, the taxpayer Trotz owned 79 per cent of the outstanding stock and the lesser shareholder owned 21 per cent. The Tenth Circuit remanded the case for a factual determination by the Tax Court of whether any difference between the values per share of the large and small blocks brought Trotz's holding above 80 per cent in value. In contrast, in the present case any extra value per share in Parker's stock will bring his holding above 80 per cent in value. No determination is needed of how much more per share Parker's stock is worth." [Emphasis in original.]

As will be noted, the fact situation in *Parker* might be considered to be the obverse of the issue of valuation present in this case. In *Parker*, the taxpayer owned exactly 80% in number of the shares of the corporation, whereas the other stockholder owned his stock subject to an obligation, limiting his power of sale. We held that this automatically reduced the value of the minority holding per share as a matter of law, thus resulting in our holding that the 80% block was worth more than 80% in value.

This Court, further, in the *Parker* case based its decision equally on the fact that Parker had absolute control of the corporation. We said: "We reiterate that in the present case it is sufficient for the rendering of judgment to note that the restriction on Eaves's stock *and its minority qualities* combine to have some depressing effect, no matter how small, on its value per share." 376 F.2d at 410. [Emphasis added.]

In *Trotz v. Commissioner of Internal Revenue*, 10th Cir. 1966, 361 F.2d 927, the Court of Appeals for the Tenth Circuit, in a case in which the taxpayer owned 79% of the stock, stated that:

"The phrase 'in value' as used in § 1239 must have an intended meaning. If the 80% determination is to be on the basis of the number of shares outstanding, no reason exists for the use of the words 'in value.'

\*   \*   \*   \*   \*   \*

We make no comment on the claim that the taxpayer in fact owned more than 80% in value of the outstanding stock. This presents a factual issue for determination in the first instance by the Tax Court. All we hold is that a numerical count of outstanding shares, in and of itself, does not determine the percentage of value. . . ." 361 F.2d 930.

This Court, in its *Parker* decision, quoted with approval the following commentary dealing with the inherent attribute of control in giving extra value to the shares of a majority block of stock:

" 'Even absent any contemplated change in management, control increases the value of an investment by protecting it. The power to change the management, even while unexercised, protects the investor with control against an abrupt change by someone else and against a gradual deterioration of the incumbent management. Therefore, in a sense, controlling shares are inherently worth more than noncontrolling shares for reasons relating solely to investment value. When control is diffused, the same reasoning establishes, to a lesser degree, that shares enabling their holder to particpate in control are worth more than those that do not. This is the strongest part of any argument against a broad reading of [*Perlman v. Feldmann*, 2 Cir. 1955, 219 F.2d 173, cert. denied 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955)]. It is the kernel of truth in the assertion that a premium paid for controlling shares are inherently worth more than minority shares.' Andrews, The Stockholder's Right to Equal Opportunity in the Sale of Shares, 78 Harvard L.Rev. 505, 526 (1965) [Footnote omitted]." 376 F.2d 410.

■ The taxpayer here contends that a majority of the stockholders in a Texas corporation do not have all of the elements of "control" that may inhere in such majority in other states. He contends, for instance, that the corporation could not be dissolved by less than 80% of the stockholders and that the corporation could not be dissolved or the major part of its assets sold without a unanimous vote of stockholders. This, of course, does not counter the proposition that in the every day management and control of the corporation, the hiring and firing of employees, the fixing of salaries and setting major policies, including the election of the directors of the company constitute a body of rights in the majority that makes them inherently worth more than minority shares.

Since the law clearly recognized that in determining the question whether stock ownership is or is not in excess of 80% in value, it is possible for 79.975% of shares to equal more than 80% in value, there could be no doubt but that the jury should be told

of this principle. Jury trials of tax claims may be sufficiently hard in ordinary fact determination cases, but it occurs to us that the fact that 79% may equal 81% in certain type situations would come as a complete surprise to a tax case jury without instructions from the court that the law contemplates (otherwise the words "in value" would not be included in the section) that something less than 80% in numbers may equal more than 80% in value, the issue could not properly be presented to the jury.

■ The taxpayer contends that the requested instructions are not all separately technically correct, pointing to the fact that Rule 51 of the Federal Rules of Civil Procedure contemplates that the proposed or requested charge be word perfect.

Dealing with this subject, Wright and Miller, Federal Practice and Procedure, contains the following apt observation: "If the request directs the court's attention to a point upon which an instruction to the jury would be helpful, the court's error in failing to charge may not be excused by technical defects in the request," *citing Florist's Nationwide Telegraphic Delivery Network v. Florist's Telegraph Delivery Association,* 371 F.2d 263 (1967) 7th Cir., *Marshall v. Isthmian Lines, Inc.,* 334 F.2d 181 (1964), 5th Cir., and *Messer v. L. B. Foster Co.,* 254 F.2d 412 (1958), 5th Cir. The quotation continues: "Ultimately it is the responsibility of the court to be sure that the jury is properly instructed," citing *McClendon v. Reynolds Electrical & Engineering,* 432 F.2d 320 (1970) 5th Cir., in which we quoted the following language from 2 Barron and Holtzoff, Federal Practice and Procedure, § 1105, p. 470 (1961):

"It is the inescapable duty of the trial judge to instruct the jurors fully and correctly on the applicable law of the case, and to guide, direct and assist them toward an intelligent understanding of the legal and factual issues involved in their search for truth. As one court says, 'This duty is not fulfilled by mere abstract statements or legal definitions, but rather by a fair and impartial statement of the factual issues and the law applicable thereto. The instructions ought to be stated in logical sequence and in the common speech of man if they are to serve their traditional and constitutional purpose in our system of jurisprudence.' "

The requested charges here clearly presented to the district court a request that it instruct the jury that in valuing the shares of a corporation in such a case as this, there was one attribute of value to be considered in determining whether a number of shares amounting to less than 80% of the total had, in fact, a value in excess of 80% and that that attribute was the fact that the 79.975 percentage of the total number of shares of stock in the company had an added value because they represented more than a controlling interest in the corporation. If the taxpayer wished to have the court charge as well that such added value could be overbalanced by other considerations, such as the potential claim of Broun for a part of the Dahlgren stock, this did not make it any less important for the trial court to give the requested charge.

■ We consider that under the circumstances prevailing at the trial of this case, after the trial court expressed wishes that the refused charges not be further discussed with her, counsel for the Government adequately perfected its right to appeal from the refusal of the trial court to submit the requested charges. Upon calling on counsel whether they had objections to the judge's charges or failures to charge, the court said:

"Now, you understand that all of the requested issues and instructions that have not been given have been marked 'denied' and I have noted your objection. MR. GOODFRIEND: (Counsel for taxpayer) Thank you, Your Honor, thank you. THE COURT: So I request that you not repeat."

Upon being so instructed by the court, Government counsel adequately protected its right to appeal from any erroneous failure of the trial court when it made the following comment:

"May it please the Court, the defendant believes that its requested instructions numbers 1 through 25 were necessary to a proper understanding by the jury of the issues involved in the case, and note its exception to the court's failure to give those instructions. It is understood that the Court has noted on the requested instructions that the request had been denied."

It is apparent that counsel for the taxpayer also understood that the trial court did not wish to have any further comments on its denial of requested instructions for taxpayer said:

"We have—as the Court has instructed us, the Court has expressly noted the denial of all our other instructions, requested instructions, and therefore I will not restate those, at the Court's request but as I understand it, our error, if any, on those instructions is preserved."

To this comment the Court answered: "It is."

## III. INADEQUATE CLAIM FOR REFUND

The Government's second assignment of error relates to the trial court's overruling of the motion by the Government to exclude evidence of the Broun claim against a portion of Dahlgren's stock on the ground that a proper construction of § 7422 of the Internal Revenue Code of 1954 and the regulations supporting it would prohibit proof of such claim as a basis for the jury's consideration whether Dahlgren's stock exceeded 80% in value.

The statute provides as follows:

"(a) *No suit prior to filing claim for refund.*—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof."

Treasury Regulations issued pursuant to this section are as follows:

"§ 301.6402–2 *Claims for credit or refund.*

(b) *Grounds set forth in claim.* (1) No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period. The claim must set forth *in detail each ground* upon which a credit or refund is claimed *and facts sufficient to apprise the Commissioner of the exact basis thereof.* The statement of the grounds and facts must be verified by a written declaration that it is made under the penalties of perjury. A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit." 26 C.F.R. § 301.6402–2 [Emphasis added].

Recognizing that the underlying purpose of § 7422 and of the regulations is to assist in the administrative handling of claims for refund and, when fully presented, optimistically to avoid the necessity of filing a civil action on the claim, this Court has stated:

"The Commissioner should not be left to his own devices in order to discover the precise nature of a taxpayer's claim and thus be placed in a position of having to hazard a guess. * * * The Commissioner does not possess the time or resources to perform extensive investigations into the precise reasons and facts supporting every taxpayer's claim for refund. The need for investigation can be easily obviated by a taxpayer who takes the proper care in preparing his claim for refund."

*Stoller v. United States,* 444 F.2d 1391, 1393 (1971).

Here the deficiency notice sent to the taxpayer by the Commissioner mistakenly stated that the taxpayer's ownership was *numerically* 80% (instead of 79.975). The notice states:

"Section 1239 provides ordinary income tax treatment of any gain recognized from sale or exchange of a depreciable property between an individual and a corporation in which the individual owns more than 80% in value of the outstanding stock. As noted above Mr. and Mrs. Dahlgren owned exactly 80% of the outstanding stock of Dahlgren Manufacturing Company (this, as indicated above, is in error. It should be 79.975%). The question remains did the taxpayer own more than 80% of the value underlined and quoted of the outstanding stock. The C.L. Parker, C.A. 5, 67–1 U.S. Tax Court at ¶ 9380, 376 F.2d 402 held in a similar situation that the taxpayers' 80% stock interest would have more value than the 20% minority stockholders' stock. The court further stated that the restriction on transfer of the minority stockholder stock and his lack of control over corporate affairs reduced the value per share of his stock below that of the taxpayers."

It thus was made to appear that the Commissioner based his determination of taxpayer's further liability on the "Parker principle" which we have discussed above.

In his protest to the deficiency notice, as in his subsequent claim for refund, taxpayer merely denied the Commissioner's contention as to the value of his ownership. This protest stated:

"The revenue agent then goes on to say that nevertheless Mr. Dahlgren's transfer of the patent to the corporation does not fully qualify for capital gains treatment because Mr. and Mrs. Dahlgren owned more than 80% in value of the outstanding stock of the corporation.

The revenue agent's conclusion in this regard is in error. Mr. and Mrs. Dahlgren did not own more than 80% in value of the outstanding stock of the corporation and (sic) at the time of his transfer of the patent to it."

The claim for refund, used the same language. While we can understand the feelings of the commissioner that he was not advised in the protest letter or the claim for refund that the real "basis" of the "ground" upon which the taxpayer was hoping to prove the final value of his stock ownership, the Government certainly did not complain when the taxpayer proved what should have been apparent from the start that Dahlgren's ownership was numerically less than 80%. This being so, the number of shares owned by the taxpayer was definitely an issue. Certainly, the attributes of the block of the stock which would normally add to or subtract from its intrinsic value would also be an issue, because that is what the Government undertook to establish under the Parker principle. We therefore conclude that evidence of a claim against some of Dahlgren's shares was evidence on the basis for his ground of recovery contemplated by the claim for refund. It is inconceivable to think that if the Government was undertaking to prove that 79.975% of stock in Dahlgren Manufacturing Company was worth more than 80% in value, it would fail to make full inquiry as to any circumstances surrounding the stock which would add to or subtract from that value. It may well be in this case that, relying on its understanding that Dahlgren owned 80% outright there was nothing to worry about except establishing the Parker principle and that therefore no administrative effort was made to develop any fact dealing with other attributes of value by which the stock might have been either enhanced or burdened. It is equally true, however, that if the taxpayers had fully apprised the Commissioner of the real basis of their contention they might have avoided paying the deficiency in the first place. In any event, we conclude that the trial court did not err in admitting evidence with respect to the Broun claim.

## IV.  THE STATE COURT JUDGMENT

██ During the course of the trial, the trial court admitted in evidence a judgment of the appropriate state court of Texas, resulting from a suit for declaratory judgment brought by Dahlgren against Broun in 1969, for the purpose of ascertaining the true effect of the oral agreement made between the two on February 1, 1966.

The colloquy between the court and counsel relating to the admissibility of the judgment, all in the presence of the jury, depicts a considerable confusion as to the purpose for which the judgment was admitted in evidence. We let it speak for itself:

"MR. WARREN: Your Honor, I object to this document and ask the privilege to come to the bench and discuss the document briefly to the Court.

THE COURT: You state your objection right there.

MR. WARREN: I object to it on the ground, Your Honor, that in addition to the fact that it does not appear to be relevant to these proceedings, it contains prejudicial—I think very prejudicial statements to the Government which I am reluctant to state in the hearing and the presence of the jury, but nonetheless, the United States was not a party to this action. It ought not to bound by it.

I believe it to be the law that a retroactive Judgment of a State Court is not to be—is not to be considered as binding upon the United States in a tax case. I believe that it is offered for the purpose of showing that Mr. Broun owned stock of this Dahlgren Manufacturing Corporation prior to the time—

THE COURT: What is the date of the document?

MR. HAUER: It's May 26th, 1970 is the date of the Judgment.

THE COURT: I sustain the objection.

MR. HAUER: We offer Plaintiffs' Exhibit 9, Your Honor, not for anything other than as a Judgment which conclusively has determined the rights between Steve Broun and Harold Dahlgren. We don't offer it for any other purpose, and we think it's admissible I believe for that respect, because as between them it conclusively determines their rights. When Mr. Warren says that it's not binding on the Government, it is nonetheless some evidence of—evidence which is admissible in this case.

THE COURT: It may be introduced for that purpose.

MR. HAUER: Yes.

THE COURT: But just read that part of it, and not the whole instrument, and point out that—

MR. HAUER: The part I am going to read is the part he is objecting to, and it constitutes a final adjudication of the rights as between Mr. Broun and Mr. Dahlgren.

THE COURT: That part of it you may read which adjudicates their rights, but not the reasons for it or whatever the preface to it.

MR. HAUER: All right. Yes, I will just read that part, Your Honor.

THE COURT: And I will say that it isn't binding on the Government. It is just evidence of the interest of Mr. Broun and Mr.—

MR. HAUER: Dahlgren. Yes."

Thereupon, counsel for the taxpayer read the following to the jury:

"It is therefore ordered, adjudged and decreed that the Defendant and Cross-plaintiff, Steve F. Broun, is and has been since 1964 the owner of 10% interest in Dahlgren Manufacturing Company, Inc. and the Plaintiff and Cross-defendant, Harold P. Dahlgren, is hereby directed to forthwith deliver to the Defendant and Cross-plaintiff, Steve F. Broun, 10% of the authorized and issued stock of Dahlgren Manufacturing Company, Inc., i. e. four hundred and eighty three shares, and to cause same to be transferred to the books and records of Dahlgren Manufacturing Company, Inc. so as to reflect the ownership of said stock by the Defendant and Cross-plaintiff Broun."

Colloquy between Government counsel and the court continued as follows:

"MR. WARREN: At this time—

THE COURT: I particularly instruct the jury that this does not bind the Government in any way, and is only evidence.

MR. WARREN: Your Honor, in view of the fact that it has been read to the jury, and in view of its prejudicial nature, in view of the fact that I sought to keep it away from the jury, I think that it's incumbent upon me at this time to move

for a mistrial on the grounds that the statement is so prejudicial that an instruction of the Court cannot remove its effect.

THE COURT: I overrule the motion."

No one could doubt the devastating effect on the value of Dahlgren's block of stock, theretofore assumed to be 79.975% of the total, of a state court judgment adjudging and decreeing that Broun was, and had been since 1964, the owner of 10% interest in Dahlgren Manufacturing Company, Inc. This is especially true in light of the fact that the trial court withdrew its original order sustaining the objection upon taxpayer's counsel's further statement that it was offered "not for anything other than a judgment which conclusively has determined the rights between Steve Broun and Harold Dahlgren . . . because as between them it conclusively determines their rights . . . ." The court then said: "It may be introduced for that purpose." And later said: "That part of it you may read which adjudicates their rights" and subsequently "I will say that it isn't binding on the Government. It is just evidence of the interests of Mr. Broun and Mr. — . . ."

On this appeal, taxpayer's counsel contend that the evidence was submitted solely for the purpose of showing the sincerity and firmness with which Broun was asserting his right to an interest in Dahlgren's stock. The record does not bear this out. Both parties agree that the state court judgment is not binding as to the facts upon which it is based in a manner that will be controlling as against the United States. The Government relies upon the case of *Commissioner v. Estate of Bosch*, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967) for the proposition that "when the application of a federal statute is involved, the decision of a state trial court as to an underlying issue of state law should *a fortiori* not be controlling." We need not consider whether *Bosch* would control a state court determination of a fact issue in a plenary adversary suit in a state court trial in which application of undisputed state law to a given fact situation resulted in a judgment creating property rights that might later bear upon the application of a federal taxing statute.[4] The difficulty with this bit of evidence is that it was not relevant for any purpose. The issue which it was introduced to provide the answer to, was not the issue which was before the Court. That issue is what was the value of the Dahlgren block of stock, then 79.975% of all the shares, on February 1, 1966, the day of the transfer of Dahlgren's patent to it. As we have previously said in *Parker, supra*, in applying § 1239, " 'in value' is a broader phrase, and we think that it calls for the familiar, though difficult, process of fair market valuation." 376 F.2d at 408. The thing to be valued would, of course, be Dahlgren's shares of stock outstanding in his name subject to any restrictions, burdens or impediments imposed upon them. This, of course, would mean that the taxpayer could prove the outstanding agreement with Broun which the jury would be required to evaluate as one of the limiting factors of Dahlgren's stock, depending on what it determined to be the likely value of that contract. It would also mean that the proof to be adduced by the Government in order to exceed the 80% "in value" determination would have to show more than if Dahlgren's stock were held free and clear of such claims. The same is true with respect to any other outstanding contractual obligations that might have been a claim against the stock itself.

The fact that a state court judge four years later, in a bare bones judgment as to which the jury had none of the facts as to the value of Broun's services as compared with his claim for a percentage of the stock before it, concluded that Broun was entitled to 10% of Dahlgren's stock as of a date six years previously could, of course, cast no light on the actual value of the Broun claim when viewed by two parties, one a willing seller and the other a willing buyer, as of

---

4. The Government, of course, would not be bound under the rule of estoppel by judgment or res judicata in litigation to which it was not a party.

February 1, 1966. Not being recognizable as a judgment of a court for the purpose of full faith and credit in a tax refund suit or as binding under either *res judicata* or estoppel by judgment, the state court judgment was pure hearsay, the opinion of however well informed a state court judge in 1970 of what at that time he concluded was a fair disposition of the claims of Broun under the contract.

As we have already stated, the prejudicial effect of the introduction of the judgment is too plain for comment, especially in light of language of both counsel and the court that it was to be treated as conclusive on Dahlgren and Broun as to their interests in the Dahlgren block of stock. The trial court's statement that "this does not bind the Government in any way, and is only evidence" necessarily calls for the question "evidence of what?" to which the answer must be "evidence on no issue before the jury in the pending case."

## CONCLUSION

We conclude that the trial court erred in not charging the jury on the important issue presented by the "Parker principle" touching on the inherent added value increment in a controlling block of stock; that the claim for refund was adequate to permit the taxpayer to introduce evidence concerning the limiting factors touching on the value of the Dahlgren block of stock; and that the trial court erred in admitting in evidence the judgment of the trial court in the case of *Dahlgren v. Broun*.

The judgment is REVERSED and the case REMANDED to the trial court for further proceedings not inconsistent with this opinion.