MICHAEL J. SACKETT AND CATHERINE S. SACKETT, ET AL., Petitioners [1] v. COMMISSIONER OF INTERNAL REVENUE, Respondent Sackett v. Commissioner
Docket Nos. 13813-78, 13814-78, 13815-78, 13816-78.
United States Tax Court
T.C. Memo 1981-661; 1981 Tax Ct. Memo LEXIS 81; 42 T.C.M. (CCH) 1666; T.C.M. (RIA) 81661; November 16, 1981. *81 Held: In a corporate spin off the sale of the operating assets by the original corporation to a newly formed corporation in which three of the stockholders of the original corporation were the sole stockholders was not a bargain sale. The three stockholders did not receive a constructive dividend from the original corporation. Luther B. Ditch, for the petitioners. Robert A. Miller, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the taxable year 1974 as follows: Docket
No.
Petitioner
Deficiency
13813-78
Michael J. Sackett and
Catherine S. Sackett
$ 23,303.78
13814-78
Walter J. Sackett, Jr., and
Joyce V. Sackett
27,630.30
13815-78
Walter J. Sackett, Sr., and
Mary L. Sackett
35,697.95
13816-78
Sackett Investment Co., Inc.
1,809.78
These cases have been consolidated for purposes of trial, briefing, and opinion. After concessions by respondent, 1a the only issue remaining for decision is whether for the taxable year 1974 petitioners Michael J. Sackett, Walter J. Sackett, Jr., and Walter J. Sackett, Sr. (hereinafter sometimes referred to collectively as petitioners), received a dividend from *82 the A.J. Sackett & Sons Co. within the meaning of sections 301(a) and 316(a). [2] Resolution of this issue depends on whether the purchase by one corporation from another corporation, both controlled by petitioners, of all the stock of such other corporation's wholly owned subsidiary was for less than the fair market value of such stock. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Michael J. Sackett (hereinafter Michael) and Catherine S. Sackett, husband and wife, resided in Baltimore, Md., at the time they filed their petition in this case. Walter S. Sackett, Jr. (hereinafter Walter, Jr.) and Joyce V. Sackett, husband and wife, and Walter J. Sackett, Sr. (hereinafter Walter, Sr.) and Mary L. Sackett, husband and wife, resided in Severna Park, Md., at the time they filed their petitions in this *83 case. Each couple filed a joint income tax return for the taxable year 1974 with the Internal Revenue Service, Philadelphia, Pa. The wives are petitioners herein solely by reason of filing joint returns with their husbands. The instant case arose as a result of a series of transactions occurring during the taxable year 1974, the purpose of which was to spin off the manufacturing business of the A.J. Sackett & Sons Co. (hereinafter P Co.). The facts leading up to these transactions are as follows: P. Co. was founded in 1897 as a sole proprietorship by A.J. Sackett, Sr. (hereinafter A.J.). The principal business of P. Co. was the designing and manufacturing of equipment for the fertilizer industry, including equipment for the conveying, blending, and conditioning of granular fertilizers. In 1929, the business was incorporated by A.J. and his two sons, including Walter, Sr., and continued in the same line of business. At the time P Co. was incorporated, approximately 63 acres of land located in Anne Arundel County, Md., were transferred to the corporation, along with the manufacturing business. In the years following its incorporation, P Co. acquired certain marketable securities. *84 However, neither the land nor the securities (hereinafter investment assets) were in any way related to the primary business of P Co. In 1974, P Co. decided to separate the manufacturing business from its investment assets. [3] At that time the stock of the company was owned as follows: Number of
Owner
shares owned
Walter, Sr.
33
Mary L. Sackett
6
Walter, Jr.
6
Michael
6
Mary J. Beck
6
Kathleen Panzer
6
Patricia A. Jedrick
6
Walter J. Sackett, Sr.,
Nominee for Paul Sackett
6
Total
[4] 75
Walter, Sr., Walter, Jr., and Michael were officers and directors of P Co., each having worked for P Co. all his working life. The remaining shareholders were the children of Walter, Sr., and had no active role in the business. [5]
The purpose for separating the manufacturing business from the investment assets was threefold: (1) To consolidate the ownership of the manufacturing business in those who had been operating such business; (2) to protect the manufacturing business from divesture by minority shareholders upon *85 Walter, Sr.'s death; and (3) to allow Walter, Sr., to make gifts of his interest in the investment assets without losing his interest in the manufacturing business. At a special meeting of the stockholders of P Co. held March 22, 1974, the following resolutions were adopted: RESOLVED: That the Board of Directors and appropriate officers of THE A.J. SACKETT & SONS COMPANY be authorized and directed to create a new Maryland corporation to be named the Sackett Operating Company or some other name that may be available at the State Department of Assessments and Taxation of Maryland; FURTHER RESOLVED: That the Board of Directors and appropriate officers of this company be authorized and directed to exchange 20,000 shares of common stock of the par value of $ 5.00 per share of the newly created corporation for certain of this company's operating assets, including cash, real estate, machinery, and equipment, subject to certain of its liabilities as more particularly set forth on the balance sheet which will be prepared as of March 31, 1974; FURTHER RESOLVED: That the Board of Directors and appropriate officers be authorized and directed to sell the 20,000 shares of stock of the newly created *86 subsidary to the W.W.M. Corporation for $ 100,000 [6] of which $ 55,000.00 will be paid in cash at settlement and $ 45,000.00 will be in the form of a note to be paid over a number of years; Thereafter, on April 1, 1974, the Sackett Operating Co. (hereinafter Y Co.) was formed as a wholly owned subsidiary of P Co. At the same time the manufacturing assets and liabilities of P Co. were transferred to Y Co. in exchange for all 20,000 shares of the common stock of Y Co. The assets transferred included the manufacturing plant in Baltimore, along with the machinery and equipment therein (operating assets). The fair market value of these assets at the time of transfer was $ 295,000. The plant was a conventional metal-fabricating plant containing conventional equipment for the processing of steel plate, which could have been used for manufacturing equipment other than that used in the fertilizer industry. In addition, current assets and liabilities were also transferred, [7] to the extent they were incurred as a result of the manufacturing *87 business. At the time of this transfer, P Co. was subject to a potential liability in the amount of approximately $ 250,000 as the result of malperformance of certain manufacturing equipment it had manufactured and installed for International Trading Co., Inc. (hereinafter ITC). In 1971, P Co. had contracted with ITC to build four machines used for transporting and loading Kaolin clay, [8] known as bulk toters, at a cost of $ 122,000. In August 1972, these bulk toters were installed, but did not perform as guaranteed. Walter, Sr., attempted to make adjustments to the machines in 1973 but was unsuccessful in correcting the problems. ITC employed outside engineers to attempt to correct the problem and advised petitioners that their company would be held responsible for the costs and damages. Damages suffered by ITC were of a continuing nature and included the costs of modifications and repairs to the machines, as well as for *88 additional expenses incurred by failure of such machines, such as ship charter costs, labor to store and load Kaolin by hand, and additional stevedoring costs. A letter to ITC from its attorneys dated August 14, 1974, stated that ITC had "$ 375,578 of damages which it has a reasonable chance of proving." In the late summer or early fall 1974, ITC filed suit against A.J. Sackett & Sons Co. (Y Co.) [9] *89 for $ 750,000. Sometime thereafter Y Co. filed a counterclaim for $ 43,168, representing $ 12,200 remaining due on the contract price and $ 30,968 for work performed by Walter, Sr., on the machines which Y Co. claimed was not necessitated by any breach of contract on its part. On September 29, 1976, the suit was settled for $ 102,977, plus ITC's costs and attorney fees and release of counterclaims filed by Y Co. At the time the spin off of the manufacturing business to Y Co. took place, it was understood by Walter, Sr., Walter, Jr., and Michael, as well as the remaining shareholders of P Co., that Y Co. would be responsible for payment of whatever liability was eventually determined to be owed ITC, since such potential liability had been created by activity of the manufacturing business. During the 5-year period immediately preceding the taxable year 1974, P Co. had not paid its shareholders a dividend and thus the salaries paid petitioners were the only remuneration received by any of the shareholders of such company. The financial statements prepared by Y Co.'s accountants for the taxable year ending December 31, 1974, showed current liabilities of $ 637,150, with an accompanying note stating "The company is involved in litigation concerning a contract the price of which was $ 122,000. Counsel is unable to estimate the extent of the possible liability at this time." When the suit was settled on September 29, *90 1976, it was Y Co. which made the payment in satisfaction thereof. On April 1, 1974, simultaneously with the transfer of the manufacturing business to Y Co., the following transactions occurred: (1) The W.W.M. Corporation (hereinafter X Co.) was formed by petitioners, each purchasing 50 shares of stock for $ 5,000. At the first meeting of its board of directors, composed of petitioners, the following resolutions were adopted: RESOLVED: That the appropriate officers of the Corporation be, and they hereby are, authorized and directed to take all action necessary and appropriate for acquiring all of the outstanding stock of Sackett Operating Company [Y Co.], for $ 100,000.00 in cash of which $ 55,000.00 is to be paid at closing and the balance to be paid over a five year period in five equal annual payments of $ 9,000.00 each, the first payment being due on January 1, 1976, and each year thereafter with annual interest of 5% on the unpaid balance. RESOLVED: That the Board of Directors of W.W.M. Corporation deem it advisable and to the best interest of this Corporation that it merge with its subsidiary, Sackett Operating Company, Inc. and hereby approves and ratifies the Agreement and *91 Plan of Merger and Articles of Merger attached to these minutes; * * * (2) X Co. borrowed $ 40,000 from the First National Bank of Maryland and purchased the Y Co. stock from P Co. for $ 55,000 in cash and a note for the remaining $ 45,000. (3) P Co. amended its charter and changed its name to Sackett Investment Co., Inc.
(4) An Agreement and Plan of Merger was entered into between X Co. and its wholly owned subsidiary, Y Co. and pursuant to the Articles of Merger, X Co. was merged into Y Co. In accordance with such Articles of Merger, Y Co. amended its charter and changed its name to the A.J. Sackett & Sons Co. The end result of all these transactions was that P Co.'s name was changed to the Sackett Investment Co., Inc., but was owned in the same proportion by the same eight individuals as just prior to such transactions. The manufacturing portion of the business was then operated under the corporate umbrella of Y Co., whose name had been changed to the A.J. Sackett & Sons Co., and which was owned equally by Walter, Sr., Walter, Jr., and Michael, each having 6,666-2/3 shares of the total 20,000 shares outstanding. During 1973 and early 1974, prior to engaging in the above transactions, *92 petitioners contacted George W. Cox (hereinafter Cox), a CPA with Coopers and Lybrand in charge of all tax matters handled by their Baltimore office. Cox was an expert in valuation of closely held corporations for, among others, acquisition purposes. He was hired as an outsider to determine the worth of the manufacturing business so as to protect the other stockholders of P Co. who did not take an active part in the operation of the business and would not become stockholders of the operating company. He concluded that the value was not in excess of $ 75,000. In arriving at this value, Cox used two factors. First, he looked to the book value [10] of the operating assets as increased by their insured value, [11] *93 and then decreased this amount by the potential liability to ITC. In this regard, he had been provided a letter from P Co.'s attorney dated October 29, 1973, which stated that as of March 21, 1973, damages claimed by ITC totaled $ 263,335 and he was told to take this into consideration in arriving at a value for the operating business. At this point he determined the value to be approximately $ 100,000. Second, he looked to the earning capacity of the manufacturing business by analyzing the financial statements for the taxable years 1969 through 1972 as well as for the 6-month period ending June 30, 1973. In so doing he gave the greatest weight to the 1973 figures and the least weight to those of 1969. He concluded that the fair market value of the manufacturing business was $ 75,000. Cox did not directly give consideration to the liquidating value of the business though such value was stated to be inherent in the book value of the assets, as adjusted, less liabilities, including the potential liability to ITC. In his opinion, without the ITC liability, the business would have been worth $ 338,335. [12]
In preparation for trial of this case, petitioners engaged Kenneth W. McGraw (hereinafter McGraw), an expert in valuing securities of closely held corporations, for the purpose of valuing the stock of Y Co. as of April 1, 1974. He concluded that the fair market value of such stock was less than $ 5 per share. In making such a determination, he considered, among others, the *94 following factors: The nature of Y Co.'s business and factors which affect it; its history and management; historical operating results of the manufacturing business, particularly earnings generated and factors affecting earnings; dividends paid as well as the payout and dividend-paying capacity; the financial condition, both past and current, including an analysis of its assets and invested capital; the book value of its assets, past and current; economic and industry trends as they related to petitioners' business herein; comparisons between the business and five comparative companies; the stock's lack of marketability, and premium for control, as applicable. In addition to these factors, McGraw considered the potential liability to ITC. In his appraisal report submitted into evidence, he stated: Any buyer of the AJS [Y Co.] common stock would have been seriously concerned about the potential impact of the pending dispute with ITC. As early as October, 1973 the total damage claimed against AJS had mounted to over $ 260,000. [13] It is unlikely that an investor would have purchased the shares of AJS without a major concession in price or an agreement regarding indemnification. *95 It is reasonable that valuable real estate and liberal working capital financing [both of which Y Co. had] would have been viewed as quid-proquo for the potential liability. Such an item does not lend itself to more precise definition, particularly at the stage of the dispute at April 1, 1974. The fair market value of Y Co. stock, as determined by McGraw, was a "going concern value," based on all those factors that in his opinion a potential investor would consider when presented an opportunity to purchase a minority interest (up to one-third) of Y Co. In so doing he noted the manufacturing business of P Co. which was transferred to Y Co., had operated at a loss in three of the five previous years, and that even in the profit years, the level of profitability was low. He did not give much consideration to the company's "liquidation value" [14] because there was no indication a liquidation was intended and no one stockholder had adequate voting power to effect a liquidation. However, it was his opinion that the potential liability to ITC would be a major concern to a prospective purchaser and that the liquidating value would be *96 largely offset by such claim. Respondent's expert did not determine the value of the Y Co. stock, but rather, merely determined the gross value of the operating assets of Y Co., which he determined to be $ 295,000 as of April 1, 1974. In arriving at this figure, he relied on an appraisal of the manufacturing plant (including land and building) which had been prepared on Y Co.'s behalf and which valued such plant at $ 245,000. The machinery and equipment were valued at approximately $ 50,000 by adding to their book value as of December 31, 1974, the amount of depreciation accruing between April 1 and such date. He gave no consideration to the potential liability to ITC. For the taxable year 1974, petitioners did not report any dividend income as a result of the transactions occurring on April 1, 1974. In his statutory notice of deficiency, respondent determined that petitioners had each received a dividend of $ 67,294.70 [15] *97 for the taxable year 1974 as a result of the transactions occurring on April 1, 1974. OPINION The sole issue for determination is whether for the taxable year 1974, petitioners received a dividend from P Co. as a result of X Co.'s purchase of Y Co. stock from P Co. Petitioners maintain that the price paid by X Co. for such stock, i.e., $ 100,000, was not less than its fair market value. Therefore, they argue that this was not a "bargain purchase" of such stock and thus does not result in a dividend from P Co. Respondent contends that the fair market value of the property received by X Co. was $295,000. He asserts that since petitioners were controlling shareholders of both P Co. and X Co., they received a "constructive" distribution from P Co. in the amount of $ 195,000 when X Co. purchased such property for $ 100,000. Specifically, he asserts, without explanation, that the transaction was in substance an asset purchase. Since the manufacturing assets had a fair market value of $ 295,000, he argues that a bargain purchase resulted, giving rise to a constructive distribution to petitioners. Alternatively, he argues that even if the transaction was in substance a stock purchase, the value of *98 such stock was $295,000, thereby resulting in a bargain purchase as well. Moreover, he contends P Co. had earnings and profits in excess of $ 195,000 and therefore the constructive distribution resulted in a dividend to petitioners in the amount of $65,000 [16] each. When property is transferred by a corporation to a shareholder for less than its fair market value, the shareholder has received a distribution pursuant to section 301(a) and (c)(1). [17]Honigman v. Commissioner, 466 F.2d 69 (6th Cir. 1972), affg. in part and revg. in part on another issue 55 T.C. 1067 (1971); sec. 1.301-1(g), Income Tax Regs. Moreover, it is well established that a distribution by a corporation can be treated as a dividend to a controlling shareholder if it is made primarily for his personal benefit or in discharge of his personal obligations, even though such distribution is not made directly to him. See Edgar v. Commissioner, 56 T.C. 717 (1971); Epstein v. Commissioner, 53 T.C. 459 (1969); Challenge Manufacturing Co. v. Commissioner, 37 T.C. 650 (1962); see also Equitable Publishing Co. v. Commissioner, 356 F.2d 514 (3d Cir. 1966), affg. a Memorandum Opinion *99 of this Court (payment from one corporation to another corporation under common control taxed to the controlling shareholders as constructive distributions by payor corporation). Petitioners concede that they are in receipt of a distribution from P Co. for the taxable year 1974 to which section 301 applies if, and to the extent, we determine the value of the Y Co. stock to be in excess of $ 100,000. However, they argue that X Co. did not pay less than the fair market value for such stock and thus no constructive distribution was made to them. Thus, the only issue we must decide is one of valuation. Initially, we note that the sale transaction between P Co. and X Co. *100 involved the purchase and sale of stock, not assets as respondent initially contends. Respondent has not challenged either the P Co.-to-Y Co. exchange as a valid section 351(a)[18] *101 transaction or the X Co. merger into Y Co. as a valid reorganization under section 368(a)(1)(A), [19] both of which occurred on April 1, 1974, and have been stipulated to by the parties herein. Rather, he apparently contends that the essence of these transactions was that for $ 100,000, petitioners, under the corporate umbrella of X Co., acquired all the manufacturing assets of P Co., worth $ 295,000. However, this ignores not only the form of the transactions but the substance as well. Respondent's view would have us disregard both the fact that P Co. transferred the entire manufacturing business to Y Co., including the liabilities thereof, as well as the fact that X Co. was merged into Y Co. which thereafter remained in existence, a fact stipulated to by respondent. Having determined that the sales transaction between P Co. and X Co. was of Y Co. stock, we turn to the arduous task of determining the fair market value of such stock as of April 1, 1974. The difficulty of the task before us has been somewhat diminished due to the thoroughness of petitioner's expert witness, McGraw, as well as by concessions made by both parties. Nonetheless, it involves an imprecise art which inescapably results in a Solomon-like pronouncement. See Messing v. Commissioner, 48 T.C. 502, 512 (1967). Both respondent and petitioners agree that as of April 1, 1974, the value of the operating assets transferred to Y Co. was $ 295,000 ($ 245,000 for the real estate and $ 50,000 for the machinery and equipment). With respect to current assets and liabilities transferred to Y Co., neither party has asserted *102 that one was significantly more or less than the other as of the date of transfer and we assume they essentially offset one another. [20] Moreover, both parties agree that as of April 1, 1974, the value of a minority interest in Y Co. not exceeding one-third thereof, was not in excess of $ 5 per share. The fair market value of property, including stock of a closely held corporation, is generally stated to be the price a willing buyer will pay a willing seller where both are reasonably informed and under no compulsion to buy or sell. See sec. 20.2031-1(b), Estate Tax Regs. There are no precise formulas to be used in making this determination, and either a liquidation valuation approach based on the value of the underlying assets less liabilities, [21] or a going-concern approach based on factors which a purchaser of an interest in an operating business would consider [22] are acceptable. [23] *103 In determining the value of Y Co., petitioners' expert Cox used what apparently was a combination of a "going-concern" method and liquidation value method in valuing Y Co., although he did not engage in the degree of specificity employed by McGraw. He determined the value of Y Co. not to be in excess of $ 75,000 and in so doing gave consideration to the potential liability to ITC which he was informed amounted to $ 263,335 at the time of his valuation in early 1974. Petitioners' expert McGraw valued the Y Co. stock by use of the going-concern method whereby he determined that such stock had a value of not more than $ 5 per share and thus would result in a value of $ 100,000 [24] for all the stock of Y Co. In arriving at the per-share value, McGraw analyzed the factors set forth by the Commissioner in Rev. Rul. 59-60, 1959-1 C.B. 237-244, for valuing stock of a closely held corporation for estate and gift tax purposes, and which were determined to be applicable for income tax purposes as well in Rev. Rul. 68-609, 1968-2 C.B. 327-328. *104 In addition to these factors, he considered the potential liability to ITC, which he had been informed amounted to approximately $ 260,000 as of April 1, 1974, favorable working capital loans available from P Co., and valuable real estate owned by Y Co. [25] He determined that while these factors did not lend themselves to precise quantification, they essentially offset one another. The value of the Y Co. stock as determined by McGraw represented the per-share value of a minority interest in such company. He testified that although normally the value of stock of a closely held corporation increases if the purchaser is acquiring control of such corporation, he did not add a premium to the value of the stock because, as one-third owners each of Y Co., none of petitioners alone had a controlling interest. Respondent's expert was not requested to value the stock of Y Co. as purchaser, but rather to simply value its operating assets as a disinterested party. He determined that if Y Co. had been liquidated and its assets sold on April 1, 1974, petitioners would have received $ 295,000. [26] He did not consider *105 the potential ITC claim against Y Co. in making his determination because as of the valuation date, suit had not yet been filed by ITC. Respondent asserts there was no evidence that Y Co. had assumed responsibility for the potential liability to ITC or that Y Co. had agreed to indemnify P Co. for any amount P Co. paid in respect of such liability. Moreover, he asserts that since "the nonactive shareholders were enjoying the fruits of the labors of the three active shareholders [petitioners], concomitantly, they should share reverses caused by the labors of the three active shareholders." However, when petitioners employed Cox to determine the value of the operating business they told him to take into consideration the potential liability to ITC. This would indicate that it was intended and understood that the operating company would be responsible for this liability. Furthermore, the financial statements of Y Co. for the year ending December 31, 1974, reflected that Y Co. was indeed responsible for any liability resulting from *106 the ITC claim, as did the statements for the year ending December 31, 1975. P Co.'s financial statements for such years did not reflect the existence of such liability. Moreover, it was Y Co. against which ITC had filed suit in the fall of 1974; which had filed counterclaims against ITC; which had negotiated the settlement agreed to on September 29, 1976; and, which had paid the $ 102,977 owing in respect of such settlement. Furthermore, none of the shareholders of P Co. had received any "fruits" of the business for at least 5 years prior to the spin off. The salary paid petitioners was the only remuneration received by any of the shareholders. It is clear that petitioners, as directors and officers of both P Co. and X Co., intended from the outset to have P Co. transfer the entire manufacturing business to Y Co., including all actual and potential liabilities thereof. The fact that the ITC was unaware of the corporate realignments which had occurred, or that the minutes of the meetings of P Co., X Co., and Y Co. in respect of such realignments failed to specifically mention the potential ITC liability, does not persuade us to find differently. By April 1, 1974, the amount of *107 such liability was reasonably approximated to be $ 250,000, and every indication was that such amount would increase. Whichever approach is used to value the Y Co. stock, we think the potential liability to ITC must be considered. A reasonably informed purchaser of 100 percent of the Y Co. stock would give serious consideration to such liability. Petitioners' expert, Cox, testified that although he had valued Y Co. at $ 75,000, assuming the potential ITC liability to be $ 263,335, he would advise a client interested in acquiring Y Co. not to do so "because you couldn't really come up with a firm handle on how much liability there was." In McGraw's opinion, the ITC "claim was a major cloud over the value of these [operating] assets" and "the liquidating value is largely offset by the amount of the potential claim from ITC." Respondent employed a gross liquidation valuation method in determining the value of Y Co. stock, looking solely to the gross value of the underlying manufacturing assets. However, rarely can the value of corporate stock be determined by dividing the value of the assets by the number of shares. See Williams v. Commissioner, 44 F.2d 467, 470 (8th Cir. 1930). The *108 liquidation value of a company is not simply the value of its assets, but must take into consideration the liabilities which a reasonably informed purchaser would consider. Respondent's expert did not take the ITC claim into consideration because suit had not been filed as of the valuation date. However, it is clear from the evidence that a real and ever increasing potential liability to ITC did exist as of the valuation date and petitioners had been advised of this by their attorney by letter dated March 21, 1973. Thus, in the instant case, a determination of the liquidation value of Y Co. would require a consideration of the potential liability to ITC. Furthermore, under the circumstances in this case, we think liquidation value alone should be given little weight because there was little or no likelihood that Y Co. would be liquidated. One of the purposes of separating the operating assets from the investment assets was to permit the family members who were actively engaged in the operating business to reap the benefits of their future efforts in that direction.While liquidating value might have been important to an outsider who bought control of Y Co., such was of little value *109 to petitioners who actually bought the stock. And, we might add, we are here concerned with whether the sale of Y Co. stock was a bargain purchase and hence a dividend to the petitioners. Based upon the testimony received at trial and the record as a whole, we find that on April 1, 1974, a willing buyer reasonably informed of the surrounding facts would not have paid more than $ 100,000 for the Y Co. stock. At the time of the sale of such stock, petitioners' expert, Cox, placed a value on the manufacturing business of $ 75,000.Petitioners' expert, McGraw, who was extremely well qualified and a most credible witness, determined a per share value of the Y Co. stock of $ 5 which would generate a total value of $ 100,000 for such stock. However, this value was based on a minority ownership interest, rather than 100-percent ownership which is what X Co. acquired. It can generally be stated that the value of stock will increase if a controlling interest is to be acquired, though this is not necessarily the case. See Robishaw v. United States, 222 Ct.Cl. 474, 616 F.2d 507, 514 (1980); Couzens v. Commissioner, 11 B.T.A. 1040, 1161 (1928). Regrettably, McGraw did not specifically consider *110 this so-called "premium" for control in determining the fair market value of the Y Co. stock. The only evidence presented with respect to the incremental value of acquiring control, was McGraw's opinion that "the potential liability of this ITC claim would be a major concern to anyone who would contemplate the purchase of control of the corporation." In light of all the evidence herein, we find that the value of a premium which might otherwise have been paid for control of Y Co. was minimal at most. The history of the manufacturing business was not "all that good" in McGraw"s opinion, and both he and Cox stated that the liquidating value of the manufacturing assets was largely offset by the potential liability to ITC. Thus, whether acquisition of control was desired so as to liquidate Y Co. and acquire its assets or so as to operate the business as a going concern, the size and nature of the ITC claim would have had a chilling effect on such desire. Therefore, although a premium for control was not considered by McGraw when making his determination, we find such premium not to be significant under the circumstances herein. Moreover, the value computed under the liquidation value *111 method employed by respondent, but giving appropriate consideration of the potential liability to ITC, would be at most $ 45,000 ($ 295,000 - $ 250,000). [27]
As we have noted, the determination of fair market value is an imprecise art at best. We find that the price paid for the Y Co. stock was more than adequate and, if anything, such price exceeded the fair market value of this stock. [28] In view of our finding herein, we hold that petitioners did not receive a constructive dividend for the taxable year 1974 as a result of X Co.'s purchase of all the Y Co. stock from P Co. Decision will be entered for petitioners. Footnotes
1. Cases of the following petitioners are consolidated herewith: Walter J. Sackett, Jr., and Joyce V. Sackett, docket No. 13814-78; Walter J. Sackett, Sr., and Mary L. Sackett, docket No. 13815-78; Sackett Investment Company, Inc., docket No. 13816-78.↩
1a. Respondent conceded in brief that no deficiency is due from Sackett Investment Co., Inc., for the taxable year 1974. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year in issue.↩
3. No evidence was presented as to the fair market value of such assets on April 1, 1974,↩
4. This represents all of the outstanding stock of P Co.↩
5. Michael and Walter, Jr., were children of Walter, Sr., as well.↩
6. This value was determined after petitioners had consulted Mr. Cox, an expert in valuation of closely held corporations such as P Co., as discussed infra↩ in detail.
7. No evidence was presented as to the amount of these current essets and liabilities other than the balance sheet prepared by Y Co.'s accountant, stating that total current assets and liabilities as of Dec. 31, 1974, were $ 683,047 and $ 637,150, respectively.↩
8. Kaolin is a talcum powder-type clay. It is a difficult substance to handle in that it has inconsistent characteristics, often a hard, sticky substance, while at other times, it can flow like water.↩
9. As detailed herein, infra, on Apr. 1, 1974, P Co. changed its name to Sackett Investment Co., Inc., and Y Co. changed its name to the A.J. Sackett & Sons Co., P Co.'s former name. Both at the time the suit was instituted and settled, ITC was unaware that P Co. had spun off its manufacturing business to Y Co. and that their respective names had been changed.
10. Book value of the manufacturing plant and equipment was $ 173,000. ↩
11. No evidence was presented as to the insured value of the manufacturing assets.
12. $ 75,000 + $ 263,335 = $ 338,335↩
13. This figure was provided to McGraw by petitioners.↩
14. Liquidation value as used by McGraw meant the current fair market value of Y Co.'s underlying assets less liabilities of the company.↩
15. On brief, respondent has asserted that each received a dividend of $ 65,000 ($ 295,000 - $ 100,000 - 3).
16. ($ 295,000 - $ 100,000) - 3 = $ 65,000.↩
17. SEC. 301. DISTRIBUTIONS OF PROPERTY. (a) In General.--Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). (c) Amount Taxable.--In the case of a distribution in which subsection (a) applies-- (1) Amount constituting dividend.--That portion of the distribution which is a dividend (as defined in section 316↩) shall be included in gross income.
18. SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEREE. (a) General Rule.--No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)↩) of the corporation. * * * 19. SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS. (a) Reorganization. -- (1) In general.--For purposes of parts I and II and this part, the term "reorganization" means-- (A) a statutory merger or consolidation.↩
20. No evidence was submitted as to the amount of these receivables and payables as of April 1, 1974.↩
21. See Washburne v. Commissioner, T.C. Memo. 1968-122↩. 22. See Miller v. Commissioner, T.C. Memo. 1977-39; Andrews v. Commissioner, T.C. Memo. 1976-106↩. 23. Sec. 5(a) of Rev. Rul. 59-60, 1959-1 C.B. 237, 242, suggests that when valuing stocks of companies that sell products or services to the public, the appraisers should give primary consideration to earnings rather than asset values.
24. 20,000 shares x $ 5 per share = $ 100,000 ↩
25. The manufacturing plant in Baltimore.↩
26. He stated that in his opinion, all 20,000 shares of Y Co. were worth $ 295,000 as of Apr. 1, 1974, based on the value of the underlying operating assets.↩
27. This assumes current assets and liabilities offset one another.↩
28. We think it very unlikely, under the circumstances of this case, that the father and two sons would have deliberately tried to acquire the operating business of the family owned corporation for less than they thought it was worth, to the detriment of the other members of the family. They sought and received the advice of an independent appraiser before fixing the price for the operating business.↩